Dr. Franklin H. Long, Mobile Central OB-GYN, P.C. ("Mobile Central"), Mobile Infirmary Association ("the Mobile Infirmary"), and IMC-Mobile Bay OB-GYN Associates, P.C. ("Mobile Bay"), appeal from a judgment entered on a jury verdict in favor of James Edward Wade and Angela Wade, as administrators of the estate of their deceased son, Daniel Curtis Wade, in the Wades' personal-injury/wrongful-death action against the defendants alleging medical malpractice. We reverse and remand.
 Factual Background
On June 16, 1996, in the 35th or 36th week of her pregnancy, Angela Wade was admitted to the Mobile Infirmary for the birth of twins. Mrs. Wade was the patient of Dr. Long, an obstetrician, who practiced *Page 380 
through Mobile Central. An ultrasound examination revealed that one twin was in the "normal vertex," that is, the head-down birthing position, but that the second twin was in position for a breech birth. At approximately 6:20 a.m., Dr. Long, assisted by nurses Gwen Bodden and Sydney Whiting, delivered the vertex twin, Mollie Wade, vaginally without difficulty.
Before delivering the second twin, however, Dr. Long attempted an "external version," a process that involves manually turning the baby 180 degrees inside the uterus to effect a normal vertex birth. To attempt that maneuver, Dr. Long inserted one hand into Mrs. Wade's uterus while applying external pressure on her abdomen with the other hand. Bodden and Whiting also applied their hands to Mrs. Wade's abdomen. Additionally, according to Dr. Long, Whiting applied external pressure to the abdomen with a "transducer."[1] At least two such attempts were made between 6:20 a.m. and 6:43 a.m.
According to Mr. Wade, who was in the delivery room, Bodden brought a step stool to the side of the bed, and Dr. Long stated: "You are going to put your weight to good use, aren't you?" (Emphasis added.) To this remark, Bodden replied: "Yes, sir. All short people need one of these."
At trial, Mrs. Wade described her experience during this procedure:
 "Q. [By the Wades' counsel:] Describe how the pushing felt.
 "A. [By Mrs. Wade:] It was horrible. The pain was horrible, and I kept — I told the nurses — I kept saving, `Y'all are hurting me.' You know, `this is really, really hurting. I mean, I'm in pain, please stop,' you know, `is [the baby] okay with y'all pushing? Please stop.'
 "Q. All right. What happened? Did they stop pushing?
 "A. No, sir, they did not.
 "Q. What happened next?
 "A. Nurse Bodden said that she could not push because the fetal monitor kept getting in the way . . . so she was going to take it off so that she could push. . . . So Nurse Bodden took it off, and she laid it on top of the monitor there to the left behind her.
 ". . . .
 "Q. You complained of pain?
 "A. I complained of extreme pain.[2]
 "Q. Did you say anything about a C-section?
 "A. I begged them that if they needed to do a C-section, to please do it, that I was ready for one. I was hurting. I was in extreme pain, and I was begging, you know, and I kept asking, `was [the baby] okay?'
 ". . . .
 "Q. Did they say anything about [the baby] not turning? Did anybody say anything at that point about — or any point about [the baby] not turning — [that] they could not get him to turn? *Page 381 
 "A. [On] several occasions, Dr. Long kept saying, you know, `I can't get him to turn, I can't get him to turn, he has not turned.'
 "Q. Okay. What is the next thing after that that happened?
 ". . . .
 "A. [He] told them that he was just going to deliver him breech. He said, `I am just going to have to deliver him breech. I could not get him to turn, I am just going to deliver him breech.'
 "Q. Did he deliver [the baby]?
 "A. Yes, sir.
 "Q. Tell them what happened.
 "A. He finally said: `I found the other foot,' and he said: `I'm going to pull him out by his feet,' and he pulled him out."
Daniel Wade was thus delivered vaginally in the breech position at 6:43 a.m. His color was blue, and he was not breathing. A few minutes later, Daniel was resuscitated and taken to the nursery. However, at approximately 9:20 a.m., his condition deteriorated abruptly. The deterioration was accompanied by massive and irreparable brain damage. According to Dr. Elias Chalhub, one of Daniel's treating physicians, the "hemispheres of [his] brain were essentially destroyed" and "replaced by water which is spinal fluid." Daniel lived for six years, during which he was immobile, incontinent, and unresponsive. Numerous surgeries were required to drain fluid from his brain.
On February 20, 1998, the Wades, as parents and next friends of Daniel Wade, sued Dr. Long, Mobile Bay, and the Mobile Infirmary, alleging, among other things, that the defendants "negligently failed to perform a cesarean section and/or negligently failed to properly monitor fetal heart rate and/or negligently failed to recognize or diagnose fetal distress, and/or negligently performed a vaginal delivery." According to the complaint, the defendants' negligence proximately caused, among other things, (1) "brain damage," (2) a "possibility of subarachnoid hemorrhage," and (3) the "development of hydrocephalus requiring several operations." The Wades sought compensation for, among other things, (1) "permanent mental and physical injuries," (2) "mental anguish and emotional distress," (3) "pain and suffering," (4) "expenses in connection with the medical care and treatment of [Daniel]," and (5) loss of "the society and consortium of [Daniel]."
Daniel developed cerebral palsy and died as a result of that condition on January 16, 2003. Subsequently, the Wades, as the administrators of the estate of Daniel Wade, amended their complaint to add a claim alleging wrongful death and to assert claims against Mobile Central. The Wades' last-amended complaint alleged, in pertinent part, that Dr. Long (1) "negligently failed to monitor [Daniel's] vital signs, and/or negligently interpreted [his] vital signs"; (2) "negligently failed to use the appropriate diagnostic tools or equipment to monitor [Daniel's] vital signs"; (3) "negligently failed to obtain a cord blood gas on [Daniel]"; (4) "negligently failed to recognize or diagnose fetal distress"; (5) "negligently failed to properly monitor fetal heart rate"; (6) "negligently performed or attempted to perform a version or versions"; (7) "negligently allowed or directed nurses to push on Angela S. Wade's abdomen in a negligent manner and/or to apply pressure to [Daniel] in a negligent manner"; (8) "negligently failed to perform a cesarean section"; and/or (9) "negligently performed a vaginal delivery."
Similarly, they alleged that the nurses employed by Mobile Infirmary (1) "negligently failed to monitor [Daniel's] vital signs, and/or negligently failed to properly *Page 382 
document [his] vital signs, and/or negligently interpreted the vital signs"; (2) "negligently failed to use the appropriate diagnostic tools or equipment to monitor [Daniel's] vital signs"; (3) "negligently failed to obtain a cord blood gas"; (4) "negligently failed to recognize fetal distress"; (5) "negligently failed to properly use the fetal heart rate monitor or to properly monitor [Daniel's] fetal heart rate during his delivery"; (6) "negligently . . . performed or attempted to perform a version or versions"; (7) "pushed on Angela S. Wade's abdomen in a negligent manner and/or . . . applied pressure to [Daniel] in a negligent manner, and/or negligently caused trauma to [Daniel]."
The case was tried before a jury. At the close of all the evidence, the defendants moved for a judgment as a matter of law ("JML") on the ground, among others, that the Wades had failed to prove by sufficient evidence that the medical condition from which Daniel ultimately died proximately resulted from his delivery or subsequent immediate care by the defendants. The trial court denied the motions. Reading from the Wades' last-amended complaint, the trial judge then charged the jury, in pertinent part:
 "Dr. Long was assisted by nurses from the Mobile Infirmary, repeated the version or versions, again, without success. These attempted versions, it is alleged, were traumatic and that both Dr. Long and the hospital nurses negligently failed to provide Angela and her second twin, Daniel Curtis Wade, with the medical services, care, and treatment that a similarly situated physician should have provided.
 "Specifically, it is alleged that Dr. Franklin H. Long negligently performed or attempted to perform both external and internal versions and negligently allowed or directed nurses employed by Mobile Infirmary to push on Angela S. Wade's abdomen; that they negligently failed to monitor the vital signs
and/or negligently interpreted the vital signs, negligently failed to obtain a cord blood gas on Daniel Curtis Wade, and negligently failed to perform a cesarean section which they allege was indicated under the circumstances that were in existence. Negligently performed a vaginal delivery."
(Emphasis added.)
The defendants objected to these instructions on the ground that, as to the claims of (1) negligent monitoring of vital signs, (2) negligent interpretation of vital signs, (3) negligent failure to obtain cord-blood gas, (4) negligent failure to perform a C-section, and (5) negligent performance of a vaginal delivery, the Wades had not presented "substantial evidence as to either the standard of care, or to breach of the standard of care, or as to the proximate cause." These objections were overruled.
The jury returned a general verdict against all the defendants and awarded the Wades compensatory damages. Specifically, the jury awarded $3,850,000 in compensatory damages and found that the Wades were not entitled to recover punitive damages. In other words, the jury's verdict was against the Wades on their wrongful-death claim. The defendants renewed their motions for a JML and also filed motions for a new trial. The trial court denied those motions, and the defendants appealed. Case no. 1041887 represents the appeal of Dr. Long and Mobile Central (hereinafter collectively referred to as "Mobile Central"). Case no. 1050001 represents the appeal of Mobile Bay and the Mobile Infirmary (hereinafter collectively *Page 383 
referred to as "the Hospital").[3]
On appeal, Mobile Central and the Hospital contend that they are entitled to a JML, because, they insist, the Wades failed to present sufficient evidence of causation. They also contend they are entitled to a new trial for numerous reasons. We first address the issue whether the evidence of causation is sufficient to preclude a JML for the defendants.
 I. JML
"In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences from that evidence as the jury would have been free to draw." Daniels v. East AlabamaPaving, Inc., 740 So.2d 1033, 1037 (Ala. 1999). "The denial of a defendant's motion for a JML is proper only when the plaintiff has presented substantial evidence to support each element of the plaintiffs claim." Kmart Corp. v.Bassett, 769 So.2d 282, 284 (Ala. 2000). "`Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Id. (quoting West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)).
"[T]he opinions of an expert witness may not rest on `mere speculation and conjecture.'. . . However, a theory of causation is not mere conjecture, when it is deducible as a reasonable inference from `known facts or conditions.'"Dixon v. Board of Water Sewer Comm'rs of Mobile,865 So.2d 1161, 1166 (Ala. 2003). "`"[I]f there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."'" Id. (quoting Griffin Lumber Co. v.Harper, 247 Ala. 616, 621, 25 So.2d 505, 509 (1946), quoting in turn Southern Ry. v. Dickson, 211 Ala. 481,486, 100 So. 665, 669 (1924)).
As articulated by Mobile Central, the Wades' theory of causation is that excessive force was placed upon Daniel during the external-version attempts, resulting in "direct head trauma [and a primary] subarachnoid hemorrhage" ("PSH"). According to this theory, the PSH caused, or contributed to, massive brain damage, eventually leading to the cerebral palsy and to Daniel's consequent death. Although both Mobile Central and the Hospital challenge the sufficiency of evidence of causation, the Hospital concedes that the testimony of Dr. Paul Maertens, one of the Wades' experts, "created an otherwise missing causal link between the version attempts and [the] brain injury," the Hospital's brief, at 82, and "effectively connected the versions to the injury." Id. at 18.
In that connection, Dr. Maertens testified as follows:
 "Q. [By the Wades' counsel:] Doctor, what are the causes of a subarachnoid hemorrhage — primary subarachnoid hemorrhage?
 "A. [By Dr. Maertens:] A subarachnoid hemorrhage basically [is] caused by any rupture of the bridging veins, and we showed you that those bridging veins are small little vessels that cross the subarachnoid space between the brain and the dura.[4] And those *Page 384 
veins could be ruptured by some external force or some rotary force — G-force — any G-force on those veins could rupture them. . . .
 ". . . .
 "Q. Dr. Maertens, could you assume for me that Daniel Wade did not experience any force or trauma placed on his . . . head up until the time that he goes into the delivery; in other words, in his labor there is no force on his head, there is no trauma that he has experienced. Would you assume for me that after Daniel was born, he goes to the nursery room, there is no force or trauma put on his head. If you assume further for me that as Dr. Long says that when he brought Daniel out in the breech, it was easy and there was no trauma or just an easy" slipped him out of the birth canal. If you assume further for me that Dr. Long and two nurses put force on Angela Wade's abdomen for what she has testified . . . seemed like a long time to her, and that force was sufficient to cause her extreme pain, do you have an opinion based upon a reasonable degree of medical probability as to the cause of Daniel's primary subarachnoid hemorrhage?
 ". . . .
 "Do you have an opinion as to whether it happened as a result of the force placed on him during the rotational maneuver?
 ". . . .
 "[The court:] Now, he is asking you, based on these things, is this so, and the answer is either yes or no.
 "A. [Dr. Maertens:] Okay, yes."
(Emphasis added.)
The defendants argue that the Wades' evidence did not "explain the mechanism by which the alleged PSH occurred." Mobile Central's brief, at 78-79. They contend that "Dr. Maertens did not explain how hand pressure that wasnot sufficient to rupture the amniotic sac or to leave a mark of any kind on the mother or the baby, could . . . cause a bleed underneath the fetal skull in the subarachnoid space." Mobile Central's brief, at 79 (emphasis in original).
However, the Wades also presented the testimony of Dr. Larry Griffin, who opined that Dr. Long had used excessive force in the attempted versions. He based that view, in part, on "the fact that there were at least five hands . . . putting pressure on the abdomen, only two of which [were] controlled by any one person at any one time, and no one [could] know what the other force from anyone else [was] doing." He stated: "That is alot of potential force that cannot be controlled by the person who is supposed to be in control of this situation, that is, the operating doctor." (Emphasis added.) He testified that babies occasionally suffer "soft-tissue injuries" and "traumatic fractures," including fractures of the "cervical spine," during attempted external versions. He testified that, in attempting an external version, "you can certainly
injure the head." (Emphasis added.) Debbie Burroughs, a registered nurse, testified that it was a breach of the standard of care "for a nurse to apply pressure to an abdomen [during a version attempt], whether she uses a transducer or her hand." (Emphasis added.)
The Wades also presented the testimony of Dr. Daniel Strickland, who found "very strong evidence of external trauma" at birth, and testified that direct pressure to the head during the version attempts caused a PSH. He also stated that the amniotic sac resists rupture, because, "[i]n most cases, it is very strong." *Page 385 
Based on this testimony, it is "deducible as a reasonable inference," Dixon, 865 So.2d at 1166, that the simultaneous use of five hands to attempt the external version of Daniel Wade probably resulted in "direct head trauma [and a PSH]." Consequently, the Wades have presented substantial evidence of causation, and the defendants have not demonstrated that they were entitled to a JML on the Wades' claims alleging that excessive force was used in the attempted version.
 II. New Trial
The defendants contend that they are entitled to a new trial because the trial court instructed the jury that the Wades' claims included (1) negligent monitoring of vital signs, (2) negligent interpretation of vital signs, (3) negligent failure to obtain cord-blood gas, (4) negligent failure to perform a C-section, and (5) negligent performance of a vaginal delivery (hereinafter referred to collectively as "the monitoring/delivery claims"). They repeat their contentions that, as to those claims, the Wades did not present "substantial evidence as to either the standard of care, or to breach of the standard of care, or as to the proximate cause," and they contend that the trial court erred in denying then-motions for JML as to those claims. Relying onAspinwall v. Gowens, 405 So.2d 134 (Ala. 1981), they insist that the jury's general verdict makes it impossible to determine whether the verdict was based on a "bad count"; hence, they say, the judgment entered on that verdict must be reversed.
Under the Aspinwall rule,
 "when the trial court submits to the jury a `good count' — one that is supported by the evidence — and a `bad count' — one that is not supported by the evidence — and the jury returns a general verdict, this Court cannot presume that the verdict was returned on the good count. In such a case, a judgment entered upon the verdict must be reversed."
Larrimore v. Dubose, 827 So.2d 60, 63 (Ala. 2001) (quoting Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250,1257 (Ala. 1998)) (emphasis added).
The Wades do not challenge the defendants' contentions that there was a failure of proof on some of the monitoring/delivery claims. Indeed, in open court during the trial, the Wades' counsel expressly disavowed any claim that Daniel suffered from "perinatal asphyxia." That declaration effectively negated their claim that the defendants negligently failed to obtain a cord-blood-gas reading on Daniel immediately after delivery. This is so, because one of the purposes of sampling blood from the umbilical cord or placenta is to reveal whether the baby is suffering from perinatal asphyxia. Moreover, there was no evidence indicating that failure to obtain a cord-blood sample was a breach of the standard of care of any defendant or that failure to obtain the sample proximately caused Daniel's injury. Nevertheless, the trial court charged the jury that the Wades were claiming a negligent failure to "obtain a cord blood gas on Daniel Curtis Wade" as a basis for recovery.
Similarly, the trial court charged the jury that the Wades were seeking recovery on the basis of negligent performance of a vaginal delivery. However, the Wades direct us to no testimony indicating that Dr. Long breached the standard of care in performing a breech vaginal delivery or that the breech delivery resulted in Daniel's injuries.
Instead, the Wades contend that this case does not fall within the Aspinwall rule. Specifically, they state:
 "In the present case, since specific allegations of negligent acts or omissions were submitted to the jury in a single *Page 386 
count, albeit a count predicated upon alternative acts or omissions that may not have all been proven, the Defendants' [Aspinwall] argument simply has no merit. The good count, bad count doctrine does not apply, as here, all allegations of negligent acts or omissions are contained in a single count and are pleaded in the alternative. In this case there was a single good count and no bad count, so the good count, bad count doctrine does not apply."
The Wades' brief, at 73 (emphasis added).
In opposition to this argument, the defendants rely on provisions of the Alabama Medical Liability Act of 1987, as amended, Ala. Code 1975, § 6-5-540 et seq. ("the Act"). In particular, § 6-5-551 provides:
 "In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff `and shall include when feasible and ascertainable the date, time, and place of the act or acts. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
(Emphasis added.) See also § 6-5-549:
 "In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider based on a breach of the standard of care, the minimum standard of proof required to test the sufficiency of the evidence to support any issue of fact shall be proof by substantial evidence."
(Emphasis added.) Because the legislature intended that "each alleged breach of the standard of care be proven by substantial evidence," Mobile Central's brief, at 58, application of theAspinwall rule is compelled in the context of a medical-malpractice action, according to the defendants. Thus, they contend, the Wades may not, merely by including all alleged bases of recovery in a single count of then-complaint, avoid the good-count/bad-count rule of Aspinwall. We agree.
Section 6-5-551 requires a "detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable." (Emphasis added.) Only such acts as are identified with the requisite specificity at least 90 days before trial may be tried, and no such act or omission may be submitted to the jury, except on substantial evidence. See § 6-5-549. For Aspinwall
purposes, a "count" is "`a separate and independent claim.'" See Life Ins. Co. of Georgia v. Smith, 719 So.2d 797,824 (Ala. 1998) (Cook, J., concurring in part and dissenting in part) (quoting Black's Law Dictionary 348 (6th ed. 1990)). Such are the monitoring/delivery claims at issue here. They are not merely different theories on which to recover for the same *Page 387 
acts or omissions, but constitute entirelyseparate acts or omissions, which form discrete and independent bases for potential recovery. Each such act or omission would require expert testimony as to whether it constituted a breach of the standard of care, and, perhaps, as to causation. Upon sufficient proof, each one carries the potential for liability. The plaintiff in a medical-malpractice action cannot avoid the strictures of §§ 6-5-649 and6-5-551, as implemented by Aspinwall, merely by including all potential causes of action in one count.
The defendants properly challenged the sufficiency of the evidence as to each of the monitoring/delivery claims. The trial court erred, therefore, in giving the jury — over the defendants' objections — the option of basing liability upon an act or omission for which there was not substantial evidence.
Cases on which the Wades rely for a contrary result, namely,F.W. Woolworth v. Kirby, 293 Ala. 248, 302 So.2d 67
(1974), and Mutual Benefit Health AccidentAssociation of Omaha v. Bullard, 270 Ala. 558,120 So.2d 714 (1960), are not controlling. Obviously, they predateAspinwall and would, therefore, not control overAspinwall. Moreover, both cases, neither of which involved a medical-malpractice claim, are clearly distinguishable from this case.
In Bullard, the complaint stated a single cause of action, and the plaintiffs right to recover was not dependent on the time or manner in which he was injured. Obviously, in this case, sufficient proof of the time and manner of Daniel's injury is essential to the Wades' right to recover. InKirby, the plaintiff alleged three negligent acts in the alternative, and this Court held that the defendant was not entitled to an affirmative charge on any of the alternative allegations of negligence. That case simply did not involve anAspinwall issue.
For the reasons already stated in this opinion, the submission of the monitoring/delivery claims to the jury constituted reversible error. Consequently, the judgment is reversed and this cause is remanded for further proceedings consistent with this opinion.[5]
1041887 — REVERSED AND REMANDED
1050001 — REVERSED AND REMANDED
SEE, LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and MURDOCK, J., concur in the result.
[1] According to trial testimony, a transducer is a device attached by a cable to an ultrasound machine and is similar in size and function to a courtroom microphone.
[2] Dr. Long denies hearing Mrs. Wade's complaints of pain and requests that the procedure be stopped. However, Jane Barfield, a "staff nurse" employed by the Mobile Infirmary was present during the procedure. She testified that Mrs. Wade "expressed great discomfort during the version procedure and she requested that she be C-sectioned for the delivery of Daniel." (Emphasis added.) Bar-field testified that Dr. Long "continued with the version attempts for . . . some time after [Mrs. Wade] requested a C-section and complained of pain."
[3] The Wades have not appealed the judgment entered on the adverse verdict on the wrongful-death claim.
[4] Dura is "a tough, fibrous membrane forming the outer envelope of the brain . . . and the spinal cord." Stedman'sMedical Dictionary 428 (23d ed. 1976).
[5] Because the judgment must be reversed on this ground and the case remanded, we do not address the various other grounds advanced by the defendants for a new trial.