STUART, Justice.
Wendy Godwin Baggett sued Mobile OB-GYN, P.C., in the Mobile Circuit Court alleging that one of its physicians, Dr. Phillip Madonia, committed medical malpractice while treating her during her pregnancy and that the death of her baby shortly after childbirth was the direct result of Dr. Madonia’s malpractice. Following a trial, the jury returned a verdict in favor of Baggett and against Mobile OB-GYN in the amount of $8 million. The trial court subsequently ordered a remitti-tur of $3 million, reducing the damages award to $5 million. Mobile OB-GYN now appeals the judgment entered against it, and Baggett has cross-appealed, challenging the remittitur. We reverse the judgment entered against Mobile OB-GYN and remand the cause for a new trial; accordingly, Baggett’s cross-appeal is dismissed as moot.
I.
Baggett became a patient at Mobile OB-GYN on March 1, 2004, when Dr. Madonia began treating her for high blood pressure and depression. At that visit and at succeeding visits over the next several months, Dr. Madonia tried prescribing various medications to treat Baggett, eventually settling on Benicar for her high blood pressure and Wellbutrin and Prozac for her depression. Baggett testified that the medications Dr. Madonia prescribed had a positive impact on how she felt.
On October 25, 2004, Baggett again visited Mobile OB-GYN after a home pregnancy test indicated that she was pregnant. Dr. Madonia confirmed the results of that test, estimated that she was approximately six weeks pregnant based on a pelvic exam, and gave Baggett a prescription for prenatal vitamins. Dr. Madonia testified that he also spoke with Baggett about the medications she was taking and told her that she could continue taking Wellbutrin and Prozac but that she should stop taking Benicar because there were strong warnings against taking it during pregnancy. However, Baggett testified that Dr. Madonia told her that it was fine for her to continue taking all of her current medications, and she continued to do so.[1] Baggett testified that on several succeeding visits to Dr. Madonia’s office she asked about the safety of the medications she was taking during a pregnancy, but neither Dr. Madonia nor his nurse, Amy Clossman, ever told her to stop taking Benicar; both Dr. Madonia and Clossman testified that Baggett never asked them whether she should continue to take Beni-car once she learned she was pregnant and that they did not know that she continued taking it during her pregnancy. Although Baggett’s medical records indicate the date on which Benicar was prescribed to her, none of Dr. Madonia’s notes and nothing in the medical records maintained by Mobile OB-GYN indicate that she was ever told to discontinue taking Benicar after she became pregnant.
Baggett returned to Mobile OB-GYN for monthly pregnancy checkups in November, December, and January. Ultrasound examinations were conducted in *1132 November and December, and those examinations, along with other testing done during those visits, indicated that Bag-gett’s pregnancy was progressing normally. On February 7, 2005, Baggett returned to Mobile OB-GYN for her fifth prenatal visit with Dr. Madonia. Another ultrasound examination was performed on this visit, and the technician conducting this examination did not indicate any problems in her summary of the examination; in fact, she specifically noted that the level of amniotic fluid was normal. However, Dr. Madonia subsequently testified that Baggett’s amniotic-fluid level at the time of that ultrasound examination, 6.69 centimeters, was low, but that he did not realize it at the time because he had relied upon the technician’s summation of the ultrasound examination instead of looking at the entire report. Low amniotic fluid, or oligohydramnios, is a condition associated with Benicar exposure during pregnancy.
Baggett’s next two prenatal visits to Mobile OB-GYN took place on March 7 and April 4, and nothing during those visits indicated that Baggett’s pregnancy was anything other than normal.[2] On April 25, Baggett returned for her next scheduled appointment. During her visit with Dr. Madonia, Baggett reported that she had experienced some vaginal mucous discharge. Dr. Madonia examined her cervix, but did not see anything abnormal. To assure Baggett that everything was normal, however, Dr. Madonia ordered another ultrasound examination. When this ultrasound was performed, it showed that Baggett had virtually no amniotic fluid and that the fetus was in distress. Dr. Mado-nia immediately transferred Baggett to the high-risk obstetrics clinic at the University of South Alabama Children’s and Women’s Hospital, and shortly thereafter an emergency caesarean section was performed and a baby boy was delivered.
The baby’s condition, however, was not good, and, after an examination, his primary physician, Dr. Richard Whitehurst, indicated in his notes that the baby suffered from hypotension related to maternal Benicar exposure. In another note written the following day, after the baby was given a transfusion, Dr. Whitehurst stated his diagnosis as hypotension, anuria, and Benicar exposure. The baby died on April 27, approximately 36 hours after birth. Baggett testified at trial that, following the baby’s death, Dr. Whitehurst recommended that an autopsy be performed because he believed that Benicar exposure was the cause of the baby’s problems. An autopsy was performed, and the pathologist who performed that autopsy, Dr. Elizabeth Manci-Gardner, concluded that “[t]he most likely cause of death in this case is decreased uteroplacental blood flow.” Baggett introduced evidence at trial indicating that decreased uteroplacental blood flow in a mother, as well as hypotension and anuria in a baby, are conditions associated with exposure to Benicar during the pregnancy.
On July 12, 2005, Baggett filed a medical-malpractice action against Mobile OB-GYN in the Mobile Circuit Court, alleging that its negligence and/or wantonness was responsible for the death of her baby. The case proceeded to trial on November 5, 2007, and, at the close of all the evidence, the trial court charged the jury on the following five counts of negligence:
“Now, Wendy Baggett brings this lawsuit alleging the following: Negligently prescrib[ed] the drug Benicar to *1133 Wendy Godwin Baggett; two, negligently failed to appropriately follow up with Wendy Baggett and monitor her condition and that of her child; three, negligently did not have in place appropriate procedures, safeguards, and protocols to prevent the drug Benicar from being prescribed to pregnant patients; four, negligently failed to appreciate the developing signs of the developing damage the drug Benicar was causing during the pregnancy and failed to institute any remedial measures; and five, negligently did not properly evaluate the risk of allowing a pregnant patient to remain on the drug Benicar.”
On November 9, 2007, the jury returned a general verdict in favor of Baggett and against Mobile OB-GYN in the amount of $8 million. Mobile OB-GYN subsequently moved for a judgment as a matter of law, a new trial, or a remittitur, and, following a hearing on Mobile OB-GYN’s motion, the trial court entered an order denying the requests for a judgment as a matter of law and a new trial but ordering a remittitur and reducing the damages to $5 million. On April 21, 2008, Mobile OB-GYN filed its notice of appeal to this Court, and, on May 1, 2008, Baggett filed her cross-appeal.
II.
“When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003). The plaintiff in a medical-malpractice action is required to present substantial evidence indicating both that the defendant health-care provider “failed to comply with the standard of care and that such failure probably caused the injury or death in question.” § 6-5-549, Ala.Code 1975.
III.
Mobile OB-GYN argues that it is entitled to a new trial because, it claims, the trial court erred by submitting to the jury, in addition to a claim that was supported by substantial evidence, claims that tuere not supported by substantial evidence, that is, “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Mobile OB-GYN argues that, of the five counts submitted to the jury in *1134 this case, only one was supported by substantial evidence and, citing Long v. Wade, 980 So.2d 378, 385 (Ala.2007), argues that the judgment entered on the jury’s general verdict must therefore be reversed because both a good count and a bad count were submitted to the jury. In Long, this Court stated that, under the so-called good-count/bad-count rule,
“ ‘when the trial court submits to the jury a “good count” — one that is supported by the evidence — and a “bad count” — one that is not supported by the evidence — and the jury returns a general verdict, this Court cannot presume that the verdict ivas returned on the good count In such a case, a judgment entered upon the verdict must be reversed.’
“Larrimore v. Dubose, 827 So.2d 60, 63 (Ala.2001) (quoting Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1257 (Ala.1998)) (emphasis added).”
980 So.2d at 385. Accordingly, if any of the counts submitted to the jury in this case were not supported by substantial evidence, Mobile OB-GYN is entitled to a judgment as a matter of law on those unsupported “bad counts,” and the judgment entered on the jury’s verdict is due to be reversed and the cause remanded for a new trial on the remaining “good counts.” Mobile OB-GYN does not dispute that there is substantial evidence supporting the first count submitted to the jury, i.e., the count alleging that Dr. Mado-nia negligently prescribed Benicar to Bag-gett; however, it objects to all four other counts. We therefore review each of those four counts to determine whether they were supported by substantial evidence at trial.
The second count, alleging that Mobile OB-GYN “negligently failed to appropriately follow up with Wendy Baggett and monitor her condition and that of her child,” and the fourth count, alleging that Mobile OB-GYN “negligently failed to appreciate the developing signs of the developing damage the drug Benicar was causing during the pregnancy and failed to institute any remedial measures,” both relate to the ultrasound examination that was performed on February 7, 2005, and are therefore treated together. The second count specifically concerns Dr. Mado-nia’s failure to recognize that Baggett’s amniotic fluid was low, and the fourth count relates to his failure to take remedial measures to protect the fetus, including telling Baggett to cease taking Benicar, after the February 7 ultrasound examination revealed a low amniotic-fluid level.
At trial, Baggett presented substantial evidence indicating that, at the time the February 7, 2005, ultrasound was performed her amniotic-fluid level was low, that the applicable standard of care required Dr. Madonia to take action based on that fact, and that he failed to do so. That evidence included the following testimony from Dr. Madonia’s videotaped deposition, which was shown at trial:
“Q. All right. Doctor, isn’t the standard of care when you have a low amniotic fluid reading like this to hospitalize the mother to consider your treatment options?
“A. Depends on — you know, we probably wouldn’t hospitalize her with an amniotic fluid. We would repeat this at some point. Repeat it probably the next day.
“Q. But you didn’t do that in this case; did you?
“A. No, I didn’t.
“Q. Okay. In fact, until I showed you the actual ultrasound reading, which is Exhibit IF, you didn’t realize that this mother had such a low reading; did you?
“A. No sir.
*1135 “Q. Okay. Thank you, Doctor. Doctor, if you had seen that ultrasound reading in February, would you have quizzed Ms. Baggett about whether she was still on Benicar?
“A. It’s possible. I’m not sure what I — I would have done something. I’m not sure what I would have done.
“Q. The normal part of what you would have done at that point is recovered her medications with her?
“A. Probably.
“Q. All right. And if she had told you T am still on Benicar,’ you would have told her on February 7th to stop taking it; wouldn’t you?
“A. Yes.”
Baggett’s expert witness, Dr. Mark Tur-rentine, also testified on this issue:
“Q. Doctor, based on your education, training, background, the materials you have reviewed, the facts you have become familiar with, do you have an opinion to a reasonable degree of medical certainty as to whether [Mobile OB-GYN] deviated [from the standard of care] by not taking additional action after an ultrasound reading came back showing amniotic fluid level of 6.69, which Dr. Madonia himself has testified was low and required additional attention?
“A. Yes.
“Q. What is your opinion?
“A. That there should have been further evaluation following that ultrasound.
“Q. So your opinion is [Mobile OB-GYN] did deviate?
“A. Deviated from the standard of care, yes.”
Although Mobile OB-GYN also produced some evidence indicating that Baggett’s amniotic-fluid level on February 7, 2005, 6.69 centimeters, is not universally considered to be a low reading, the evidence submitted by Baggett was nevertheless sufficient to constitute substantial evidence that Dr. Madonia breached the applicable standard of care. Mobile OB-GYN does not dispute this point, but it argues that Baggett subsequently failed to put forth substantial evidence indicating that Dr. Madonia’s error caused the death of Bag-gett’s baby, that is, that the baby probably would have lived if Dr. Madonia had recognized that Baggett’s amniotic-fluid level was low and had taken remedial measures. See, e.g., § 6-5-549, Ala.Code 1975; DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala.2003) (“‘There must be more than the mere possibility that the negligence complained of caused the injury; rather there must be evidence that the negligence complained of probably caused the injury.’ ” (quoting Parker v. Collins, 605 So.2d 824, 826 (Ala.1992))).[3]
Initially, Mobile OB-GYN notes that when Baggett’s expert, Dr. Turrentine, was asked specifically about causation, he was interrupted by an objection and, after that objection was resolved, failed to answer the question:
“Q. Now, assuming that on February 7th the doctors at Mobile OB-GYN had asked Wendy Baggett are you— what medications you are taking, and she had told them Benicar, if the Be-nicar had been discontinued then, do you have an opinion as to whether little baby Andrew could have been salvaged,—
*1136 “[Mobile OB-GYN’s attorney:] Your Honor,—
“Q. —could have been saved?
“[Mobile OB-GYN’s attorney:] —pardon me. I object. Again, he has no qualifications to give that testimony at all.”
Dr. Turrentine did not thereafter express an opinion as to whether the baby could have been saved had Benicar been discontinued on February 7; instead, he began discussing a medical-journal article. Dr. Turrentine summarized that article, Fetal Toxic Effects of Angiotensin II Receptor Antagonists: Case Report and Follow-Up after Birth, published in the January 2005 edition of The Annals of Pharmacotherapy, as follows:
“Q. And what is that particular article about?
“A. This article is — has two components. It is described as a case report of an infant who was exposed to one of these ARB medications[4] during pregnancy. And then, in addition, it summarizes the articles available up until that time of other case reports of infants that have been exposed to the ARB medication during pregnancy.”
Dr. Turrentine also was asked what conclusions were drawn in this article:
“Q. Doctor, what conclusions were reached in this article about the survivability by an infant who had been on a medication such as Benicar and was then taken off of the medication Benicar up to the 28th week of pregnancy, bearing in mind that little Andrew’s ultrasound was when he was approximately 22 weeks gestational age?
“A. The article here by [Marie-An-drée] Bos-Thompson, there are three — of the ten reports that are there, there are three of them, and, again, they were — these were ARB-like medications. They were — none of them were specifically Benicar. They all act very similarly.
“In three of the cases where the medications were discontinued, I think one was at 24 weeks, one was at 25 weeks, and one at 28 weeks. And at the time the medications were discontinued, there was very minimal amniotic fluid around the baby. And in those three cases, within between two to six weeks, the fluid level came back to a sufficient level.
“Now one of these cases the family opted to end the pregnancy at 32 weeks. The other case had — the baby died at 33 weeks. But in the third case the baby was live-born.
“Q. And the baby that was live-born, two years after it was born, how was it doing?
“A. From this case report, actually it had regained a lot of its renal function and had improved tremendously.”
Thus, at no point in his testimony or discussion of the medical-journal article did Dr. Turrentine ever state, as his expert opinion, that Baggett’s baby probably would have survived if remedial action had been taken on February 7.[5]
*1137 However, even though Dr. Turrentine did not give an opinion on this point, Bag-gett argues that there is nevertheless substantial evidence in the record indicating that the baby would have survived if Mobile OB-GYN had taken remedial action on February 7. Baggett first argues that the article discussed by Dr. Turrentine is itself an expert source establishing causation. However, an examination of that article reveals that it does not, in fact, support that proposition. Indeed, after summarizing 15 cases in which fetuses were exposed to ARB medications similar to Benicar, which medications are referred to in the article as “ATI antagonists,” the article states that “[b]ased on these 15 case reports, it is not possible to conclude that the risk is really reduced when treatment is stopped early in pregnancy. Rather, it does support avoidance of ATI antagonists throughout pregnancy.” Marie-Andrée Bos-Thompson et al., Fetal Toxic Effects of Angiotensin II Receptor Antagonists: Case Report and Follow-Up after Bhih, 39 The Annals of Pharmacoth-erapy 157, 160 (January 2005). The article concludes as follows:
“Our case and review of other reported cases support the recommendation to avoid ATI antagonists during pregnancy. ATI antagonists are responsible for severe oligoamnios, which can lead to neonatal renal insufficiency and other associated abnormalities. If a pregnant woman is accidentally prescribed an ATI antagonist, the agent should be stopped as soon as possible. Monitoring of amniotic fluid volume and p2-rciicroglobulin fetal blood levels can be used to increase the likelihood of positive fetal outcomes.”
Id. Thus, this article at best stands for the proposition that if it is discovered that a pregnant woman is taking an ATI antagonist such as Benicar, she should cease doing so as soon as possible, and steps can then be taken to increase the possibility of a positive outcome. However, at no point in the article is it stated, or even implied, that if those steps are taken there is a probability of a positive outcome to the pregnancy. This same problem also exists for Baggett in regard to the following testimony given by Dr. Madonia, which she also cites as evidence of causation:
“Q. According to this article at least, there are things you can attempt to do to reverse the effect of drugs such as Benicar; correct?
“A. Yes.”
However, one cannot reasonably infer from this testimony that merely because a physician can attempt to reverse the effects of Benicar on a fetus, the probable result of such an. attempt is a positive outcome to the pregnancy.
Baggett also cites the testimony of Mobile OB-GYN’s two expert witnesses as further evidence of causation. Dr. Dwight Rouse and Dr. Max Rogers both testified on behalf of Mobile OB-GYN, and their expert opinion was that Bag-gett’s amniotic-fluid level on February 7 was not low. They testified that her fluid level was normal because it was above the five-centimeter mark, which, they claimed, is the generally recognized cutoff point for oligohydramnios. Dr. Rouse specifically testified that “there was no indication, based on the impression of the experienced sonographer, that there was anything wrong on this ultrasound,” and Dr. Rogers agreed that Baggett’s amniotic-fluid level on February 7 was “normal”; both witnesses stated that no further action was required by Dr. Madonia based *1138 on the February 7 ultrasound. Baggett argues that these two witnesses were, in effect, declaring that the baby was “perfectly normal” on February 7 and would therefore have been fine had Baggett ceased taking Benicar as of that date.
However, Baggett’s argument mischar-acterizes Dr. Rouse’s and Dr. Rogers’s testimony. Neither witness ever expressed an opinion as to the health of Baggett’s baby on February 7; rather, they expressed their opinions regarding the ultrasound report, specifically as it related to Baggett’s amniotic-fluid level. Neither Dr. Rouse’s statement that “there was no indication ... that there was anything wrong on this ultrasound” nor Dr. Rogers’s testimony that the amniotic-fluid level was “normal” necessarily leads to the conclusion that the baby was “perfectly normal” on February 7.[6]
It was undisputed at trial that the use of ATI antagonists such as Benicar during the second and third trimesters of pregnancy can cause injury or death to the fetus. It was also undisputed that Baggett was already approximately halfway through her second trimester when the February 7 ultrasound was conducted. No expert testified that Baggett’s baby probably would have been saved if Baggett had stopped taking Benicar on February 7 and, even when looking at the entirety of the evidence in the light most favorable to Baggett, as we must, Waddell & Reed, Inc., 875 So.2d at 1152, it is impossible to conclude that a fair-minded person in the exercise of impartial judgment could reasonably infer that Baggett’s baby probably would have been saved if Baggett had stopped taking Benicar on February 7. At most, the evidence indicated only that the baby possibly could have been saved if Baggett had stopped taking Benicar on February 7. A mere possibility is an insufficient basis upon which to support a jury verdict in a medical-malpractice action. See § 6-5-549, Ala.Code 1975. Accordingly, the second and fourth counts are bad counts that should not have been submitted to the jury.[7]
*1139 IV.
Mobile OB-GYN also argues that both the third count submitted to the jury — that it breached the standard of care because it “negligently did not have in place appropriate procedures, safeguards, and protocols to prevent the drug Benicar from being prescribed to pregnant patients” — and the fifth count submitted to the jury — that it breached the standard of care because it “negligently did not properly evaluate the risk of allowing a pregnant patient to remain on the drug Beni-car” — are not supported by the evidence. Specifically, Mobile OB-GYN argues that there was no expert testimony establishing the standard of care applicable as to either count, establishing that there was a breach of that standard, or establishing that that alleged breach was the proximate cause of the baby’s death. For the reasons that follow, we disagree.
In regard to the third count, Baggett’s expert witness, Dr. Turrentine, gave the following testimony establishing the standard of care health-care providers should use in charting patients’ medications and concluding that Mobile OB-GYN did not meet that standard:
“Q. Doctor, based on your education, training and background, is it the standard of care that the documenting of the continuance, discontinuance, prescription of medications is to be charted?
“A. The standard of care is that medications, when they are started and stopped, should be documented.
[[Image here]]
“Q. Doctor, based on your education, training, background, the materials you reviewed, the facts you have become familiar with in this case, do you have an opinion to a reasonable degree of medical certainty as to whether [Mobile OB-GYN] violated the standard of care by not charting medications appropriately in their charts?
“A. Yes, they did not chart discontinuing the Benicar.”
Dr. Rouse and Dr. Rogers subsequently testified that Dr. Madonia’s charting practices did not breach the standard of care; however, Dr. Turrentine’s testimony nevertheless constitutes substantial evidence that the standard of care required Dr. Madonia to chart when medications are started and stopped and that he breached the standard of care by failing to do so.
In regard to the fifth count, the unanimous testimony of every expert who testified at trial was that when a patient taking Benicar becomes pregnant, Benicar should be immediately discontinued. Indeed, the testimony of those experts indicated that it was a violation of the standard of care not to discontinue the use of Benicar. This testimony is tantamount to stating that a proper evaluation of the risks associated with leaving a pregnant patient on Benicar will ahvays lead the evaluating physician to conclude that the risks are unacceptable and that Benicar should therefore be discontinued; by extension, any evaluation (or the failure to conduct an evaluation) that results in the patient being left on Benicar has necessarily been negligent and the evaluating physician who does not discontinue Benicar has breached the standard of care.
Thus, there was expert testimony establishing the standards of care applicable to the third and fifth counts as well as evidence indicating that Mobile OB-GYN failed to meet those standards. However, there still must be some evidence from which a jury could reasonably conclude that Mobile OB-GYN’s breach of those standards proximately caused the death of Baggett’s baby before those counts may be considered good counts. Mobile OB-GYN *1140 emphasizes that there was no expert testimony establishing proximate causation; however, the general facts underlying these counts, along with the undisputed expert testimony establishing that women who become pregnant should immediately discontinue the use of Benicar, constitute substantial evidence of proximate causation. If Mobile OB-GYN had maintained its patients’ medical records in a manner consistent with the standard of care as established by Dr. Turrentine, Dr. Mado-nia would have had a record indicating that Baggett had been prescribed Benicar, and, upon reviewing that record, he would have also seen that the record indicated that Baggett had never stopped taking Benicar. The undisputed evidence indicates that Dr. Madonia knew that Benicar should not be taken by pregnant women; thus, his evaluation of the situation after reviewing her medical records and learning these facts would have necessarily resulted in his instructing Baggett to immediately cease taking Benicar. A jury could therefore reasonably conclude that Mobile OB-GYN’s failure to properly chart Bag-gett’s Benicar use led to the negligent failure to evaluate that resulted in her continued use of Benicar and the ultimate death of her baby. The third and fifth counts were accordingly good counts that were properly submitted to the jury.
V.
After all the evidence was presented, the jury in this case was given a charge alleging five counts of negligence. It subsequently returned a general verdict in favor of Baggett and against Mobile OB-GYN, and the trial court entered a judgment based on that verdict. However, because two of the five counts the jury was charged on were not supported by substantial evidence, Mobile OB-GYN was entitled to a judgment as a matter of law on those two counts, and those counts should not have been submitted to the jury. Because we cannot presume that the jury’s verdict was based on the three remaining good counts, we must therefore reverse the judgment entered on that verdict. Long, 980 So.2d at 385. All other issues raised by Mobile OB-GYN in its appeal and the issue regarding the remittitur raised by Baggett in her cross-appeal are therefore moot, and the cause is remanded to the trial court for a new trial on the remaining good counts.
1071020 — REVERSED AND REMANDED.
LYONS, WOODALL, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
COBB, C.J., concurs in part and dissents in part.
MURDOCK, J., concurs in the result in part and dissents in part.
1071081 — DISMISSED.
LYONS, WOODALL, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ., concur.
COBB, C.J., dissents.

. Baggett in fact refilled her prescription for Benicar on October 27, 2004, two days after her visit with Dr. Madonia.

. It appears that an ultrasound examination was not performed during either of those visits.

. In her brief to this Court, Baggett emphasizes that “[Mobile OB-GYN] did not offer a single witness who testified that baby Andrew could not be salvaged as of February 7." Baggett’s brief, p. 17. However, this argument fails to recognize that the burden was on Baggett to prove causation, not on Mobile OB-GYN to disprove it.

. Benicar belongs to a class of drugs alternately referred to at trial as angiotensin receptor blockers, or "ARB medications,” and as angiotensin II receptor antagonists, or "ATI antagonists.”

. In its brief to this Court, Mobile OB-GYN also emphasizes that of the three cases discussed by Dr. Turrentine in summarizing the medical-journal article, only one baby survived:
"The fact that one baby survived out of three reported cases proves nothing. These three cases are not shown to present a sufficient statistical sample having any application to other babies exposed to Beni- *1137 car. In fact, if they suggest anything at all, it is that the Baggett baby was likely to die even if Mrs. Baggett had stopped taking Benicar following the February 7 ultrasound.”
Mobile OB-GYN’s brief, p. 37.

. The evidence in the record that does speak to this point — the package insert included with Benicar — would actually seem to rebut Baggett's argument. That insert states that "[pjatients and physicians should be aware, however, that oligohydramnios may not appear until after the fetus has sustained irreversible injury," thus indicating that Benicar may have already caused irreversible injuries even if the amniotic-fluid level appears normal.

. The Chief Justice's special writing, quoting from the autopsy report describing an autopsy that occurred 11 weeks after the February 7, 2005, ultrasound, states: " '[Tjhe most likely cause of death in this case is decreased utero-placental blood flow, which appears to have been relatively recent in onset because the fetal ... weights’ were within normal ranges for a 33-week-old fetus.” 25 So.3d at 1141 (Cobb, C.J., concurring in part and dissenting in part). The Chief Justice's special writing, relying heavily on the evidence as to decreased blood flow being "relatively recent” con-eludes: "[Tjhere was substantial evidence that Benicar lowered Baggett's blood pressure and decreased blood (low to the uterus after the February 7 ultrasound, thereby probably and proximately causing the decrease in amniotic-fluid levels after the Februaiy 7 ultrasound, which in turn caused developmental defects in the fetus and, as a result, the death of the child.” 25 So.3d at 1141. Of course, the doctor who prepared the autopsy report was not qualified as an expert on the effects of Benicar and offered no opinion on the role of Benicar in causation. Furthermore, as noted in this main opinion, no expert opinion testimony supports the view that events preceding the February 7 ultrasound examination can be disregarded so as to warrant the conclusion that lack of further evaluation by Dr. Madonia following the February 7 ultrasound probably caused the baby's death. Consequently, a jury verdict reaching the conclusion drawn in the Chief Justice's special writing would be based on speculation as to matters well beyond the expertise of a layperson.