COBB, Chief Justice
(concurring in part and dissenting in part in case no. 1071020).
I concur with the majority’s conclusion that the first, third, and fifth negligence counts were properly submitted to the jury. As to the majority’s conclusion that the trial court erred in submitting the second and fourth negligence counts to the jury, I respectfully dissent.
The journal article referenced in the majority opinion and discussed in the record does not support Wendy Baggett’s contention that the effects of Benicar can be reversed if the mother stops taking the drug. However, the record contains other evidence from which a jury could reason *1141 ably conclude that Baggett’s exposure to Benicar after the February 7, 2005, ultrasound probably and proximately caused the death of the infant. See, e.g., Ala.Code 1975, § 6-5-549 (“In the case of a jury trial, the jury shall be instructed that in order to return a verdict against a health care provider, the jury shall be reasonably satisfied by substantial evidence that the health care provider failed to comply with the standard of care and that such failure probably caused the injury or death in question.”); cf. Crutcher v. Williams, 12 So.3d 631, 640 (Ala.2008)(opinion on return to second remand) (“[T]o prevail on a medical-malpractice claim ... the plaintiff must prove that a breach of the standard of care ... proximately and probably caused actual injury to the plaintiff.”); Giles v. Brookwood Health Servs., Inc., 5 So.3d 533 (Ala.2008) (upholding a summary judgment for the defendant in a medical-malpractice case because the plaintiff did not present substantial evidence that the defendant physician’s negligence proximately and probably caused injury to the plaintiff).
Mobile OB-GYN’s own evidence at trial demonstrated that Benicar works by lowering the patient’s blood pressure, and that in doing so it decreases the flow of blood to the uterus and, ultimately, to the fetus. Insufficient blood flow to the uterus is known as uteroplacental insufficiency. Baggett introduced evidence indicating that Benicar lowered her blood pressure and caused the blood flow to the uterus to decrease. The evidence, including Mobile OB-GYN’s own evidence, also demonstrated that the decreased flow of blood to the uterus caused a decrease in the amount of amniotic fluid and that the decrease in the amount of amniotic fluid, in turn, caused the baby in this case to develop abnormally and ultimately to die.
Substantial evidence also exists to show that the critical decrease in the level of amniotic fluid, caused by taking a medication one of the effects of which is to decrease blood flow to the uterus, occurred after the February 7, 2005, ultrasound. As the majority notes, according to Mobile OB-GYN’s expert witnesses, the amniotic-fluid level at the time of the February 7 ultrasound was within the normal range. However, the undisputed evidence showed that, at the time of the child’s birth almost 11 weeks (almost the length of a trimester) later, Baggett had virtually no amniotic fluid. Moreover, Dr. Elizabeth Manci-Gardner, who performed the autopsy, concluded that “[t]he most likely cause of death in this case is decreased uteropla-cental blood flow, ivhich appears to have been relatively recent in onset because the fetal ... weights” were within normal ranges for a 33-week-old fetus.
Thus, although there was no proof at trial that ceasing the administration of Be-nicar can reverse damage that has already been done, there was substantial evidence that Benicar lowered Baggett’s blood pressure and decreased the blood flow to the uterus after the February 7 ultrasound, thereby probably and proximately causing the decrease in amniotic-fluid levels after the February 7 ultrasound, which in turn caused developmental defects in the fetus and, as a result, the death of the child.
The majority states that “no expert opinion testimony supports the view that events preceding the February 7 ultrasound examination can be disregarded so as to warrant the conclusion that lack of further evaluation by Dr. Madonia following the February 7 ultrasound probably caused the baby’s death.” 25 So.3d at 1138 n. 7. On this record, one could nevertheless reasonably conclude that the Beni-car taken after the February 7 ultrasound probably cannot be disregarded as a proxi *1142 mate cause of the baby’s death. The second and fourth counts were supported by sufficient evidence of proximate and probable causation and were properly submitted to the jury.
As a final note, I remain convinced of the correctness of Justice Murdock’s special writing concurring in the result in Long v. Wade, 980 So.2d 378, 387 (Ala.2007), in which I concurred. It is clear from the record that both counsel and the trial judge attempted to adhere to Long, which had just been released at the time of the trial in this case. However, I note that this case illustrates the complications that can arise under Long when a jury renders a general verdict after considering allegations that the defendant committed several tortious acts or omissions, any one of which could form an independent basis for holding the defendant liable. See Long, 980 So.2d at 386-87 (“[The plaintiff] may not, merely by including all alleged bases of recovery in a single count of their complaint, avoid the good-count/bad-count rule .... [The plaintiffs claims] are not merely different theories on which to recover for the same acts or omissions, but constitute entirely separate acts or omissions, which form discrete and independent bases for potential recovery. ... Upon sufficient proof, each one carries the potential for liability.”). In light of Long, the pleading requirements of § 6-5-551, Ala.Code 1975, a part of the Alabama Medical Liability Act, and the majority’s holding today, it appears that special verdicts or general verdicts accompanied by interrogatories may be a necessity in many medical-malpractice cases. See Rule 49(b) and (c), Ala. R. Civ. P. (regarding special verdicts and general verdicts accompanied by answers to interrogatories).