Janice Dixon appeals from a summary judgment in favor of the Board of Water Sewer Commissioners of the City of Mobile ("the Board"), in an action arising out of a sewage backup and discharge into Dixon's residence. We reverse and remand.
Nearly all the material facts are disputed. However, it is undisputed that on November 21, 2000, raw sewage from a sewer system operated by the Board was discharged through plumbing fixtures in Dixon's home, flooding the house, running out the front door, and forcing her to evacuate the premises. Consequently, on March 9, 2001, Dixon sued the Board, alleging, among other things, that the Board was negligent in the design, maintenance, and operation of its sewage system, including a "lift station adjacent to [her home], so as to allow . . . raw . . . sewage to escape from the . . . sewer system" and flood her home.
The Board filed a motion for a summary judgment, and the trial court entered a summary judgment in favor of the Board. In doing so, it stated, in part:
 "The plaintiff's complaint alleges that the defendant caused or allowed the sewage backup on her property. The event which led to the backup of sewage into the plaintiff's home was a grease blockage. There is no evidence that the defendant deposited grease into the sewer system or otherwise caused the grease blockage or otherwise wilfully or intentionally failed to rectify the grease blockage."
Dixon appealed.
The principles that guide our resolution of this appeal are well settled:
 "[I]n this state, no absolute liability stems from sewer system back-ups. Handley v. City of Birmingham, 475 So.2d 1185 (Ala. 1985). Liability, if any, is measured by employing a negligence analysis. To recover, the complaining party must show 1) that the defendant undertook the duty to maintain a sewer system, 2) that he negligently discharged that duty, and 3) that the complaining party's damages resulted from the defendant's negligence. See Sisco v. City of Huntsville, 220 Ala. 59, 60, 124 So. 95 (1929)."
Water Works Sewer Bd. of Ardmore v. Wales, 533 So.2d 212, 213
(Ala. 1988). On a motion for a summary judgment, "[w]e review the evidence in the light most favorable to the nonmovant, and we must resolve all reasonable doubts against the movant." Carson v. City ofPrichard, 709 So.2d 1199, 1208 (Ala. 1998). The parties' versions of events, and, consequently, the cause of the sewage discharge into Dixon's house, diverge widely.
 I. Dixon's Version
According to Dixon's affidavit, filed in opposition to the Board's motion for a summary judgment, she awoke at approximately 6:00 a.m. "to a gurgling sound and found [that] sewage had begun to enter [her] home as it was pumping out of the *Page 1163 
toilets and the tub." Her affidavit further states:
 "At around 6:00 a.m., I called . . . a plumber and began to call friends for help. They referred me to the Board of Water Sewer. I called the Mobile Board of Water Sewer number on the morning of November 21, 2000, around 7:00. . . . As sewage was entering the entirety of my home some two to three inches deep, I began to carry my pets and belongings outside of my home to my vehicles. My vehicles were parked adjacent to the lift station and in the course of carrying out my pets and belongings, I noticed that the red light was on at the lift station. The red light at the lift station was on during the time the sewage was pumping into my home as the red light was blinking.
 "2. The Board of Water Sewer representatives arrived around 8:00 . . . in the morning. By the time they arrived and did work inside the lift station, sewage had pumped into my home and through my home for one hour and everything that I had was covered with raw sewage. After they appeared around 8:00 a.m. . . . and worked at the lift station, the sewage stopped pumping into my home.
 "3. During the entire time that sewage was pumping into my home on the morning of November 21, 2000, and prior to the Board of Water Sewer arriving around 8:00 a.m., roughly an hour after I called them, the red light was on at the lift station. . . .
 "4. The red light at the lift station had been on before and was on this particular morning. The red light at the lift station has been on a number of occasions after I moved into the home three months after November 21, 2000, particularly, October 13, 2001, at which time the red light was on; however, the Board of Water Sewer was out within a few minutes to make repairs and I suffered no surcharging into my home. There have been other occasions after I moved back into my home after the November 21, 2000, event at which the red light would come on and the lift station would shut down; however, the Board of Water Sewer has been responsive to those situations and has made repairs within a matter of a few minutes and I have had no further surcharge of raw sewage into my home after November 21, 2000."
Dixon argues, among other things, that a system malfunction occurred atthe "lift station," which is located on property adjacent to, and below, her house, causing the sewage to back up into her home. She contends that the malfunction was electronically communicated to the Board's personnel through an alarm system, but that they failed to respond to the alarm in a timely manner. In support of this theory, she presented by affidavit the expert testimony of Charles Peterson, Jr., an engineer with "experience in design, supervising and/or consulting with municipal and private sewage collection, treatment and operations facilities." His testimony was based on his review of Dixon's home, "the adjacent Water-Board lift station, the Rester Coleman Construction plans for the subject lift station, and the Mobile Board of Water Sewer work orders relative to the surcharging of sewage into Ms. Dixon's home."
Peterson testified, in pertinent part:
 "3. Based on the Rester Coleman construction plans for the subject lift station and the sanitary sewer system, the collection area is such that if the lift station adjacent to Ms. Dixon's home is down and not running, the red light is on, which signals that the lift station is not functioning. If the red light is on *Page 1164 
signifying that the lift station is down, then based on the location of Ms. Dixon's home, sewage will be pushed into her home as sewage from the adjacent homes cannot be processed at the lift station. As the red light was on during the time of Ms. Dixon's surcharging, I am of the opinion that the malfunctioning of the lift station caused the sewage to surcharge into Ms. Dixon's home.
 "4. As the Board of Water Sewer is charged with the responsibility of operating and maintaining the sewage collection system, to include the lift stations, it is imperative that a prompt response be made if, in fact, the red light is on at the lift station, as, failing a prompt response, within a few minutes, sewage will overflow carrying infectious bacteria into the home of Ms. Dixon, as occurred in this case.
 "5. Further, it is my understanding that the lift station adjacent to Ms. Dixon's home is tied into the Board of Water Sewer system through a computer system which carries an instant signal to the Board of Water Sewer for a response should the lift station be down, and, in this case, the response did not occur for approximately one hour, which, based on the crucial nature of the lift station, is not an adequate or timely response to preclude the surcharging into Ms. Dixon's home as occurred."
Peterson's opinions regarding the operation of the lift station are consistent with testimony presented by the Board's employees, in particular, James Sneed, its "collections systems engineer." Sneed testified regarding, among other things, the function of the lift station:
 "Basically, [sewage] flows downhill in a gravity system. The reason that we have lift stations in Mobile is that we don't have enough change in terrain to have all the [sewage] flowing downhill all the way to the plant. So what you'll have are gravity systems set up in neighborhoods, and they flow to a lift station, and then a lift station will pump that into another system, and it will gravity flow into the next lift station and be pumped on. . . ."
Testimony from Sneed, in conjunction with testimony from other Board employees, including Malcolm Steeves, the director of the Board, indicated that each lift station is designed to receive sewage from one or more in-flowing sewer lines; the sewage flows into a reservoir, or "wet well," in which one or more pumps are located. The pumps are preset to activate automatically when the wastewater in the wet well rises to a predetermined level. Similarly, they deactivate when the wastewater falls below a preset level.
The functions of the "red light" Dixon allegedly observed on the morning of November 21, 2000, in relation to the alarm system discussed in Peterson's affidavit, are illuminated through Steeves's testimony. The red light indicates a problem with the lift station. Steeves testified that "[t]ypically," the red light would indicate that the sewage level in the wet well has exceeded the "normal operating levels." This condition could result from various causes, including the malfunction of one or more of the pumps in the lift station. Steeves said that the red light indicates that the lift station "needs attention." If the pumps in the lift station are not functioning properly, he testified, it was possible that sewage could back up into Dixon's house. Significantly, Steeves testified, a condition activating the red light would not result from a grease blockage between the lift station and Dixon's house. In other words, a grease blockage above the lift station, but below Dixon's house, would not trigger the red light at the lift station. *Page 1165 
The same conditions that trigger the red light also automatically trigger a visual and audible alarm at the Williams Wastewater Facility ("the Williams plant"). Indeed, the Board has in place an electronic monitoring capability, which it refers to as "SCADA,"[1] that according to Steeves "picks up certain information from the [lift] station and through radio transmission[s], sends a signal back to the Williams plant," approximately every eight minutes. Thus, the alarm should have sounded if the pumps in the lift station "were not working properly." The alarm, like the red light at the lift station, would not be activated by a grease blockage in the sewer lines between the lift station and Dixon's house.
 II. The Board's Version
According to the Board, the overflow occurred — not because of a malfunction at the lift station located below Dixon's house — but because of grease buildup resulting in a blockage in the sewer linebetween the lift station and Dixon's house. The Board contends that its first notice of a problem at Dixon's home, or at the lift station, was Dixon's telephone call at approximately 7:00 a.m. In other words, it concedes that it went to the lift station, not in response to a SCADA alarm, but in response to Dixon's telephone call. The Board alleges that when its personnel arrived at the lift station between 7:30 a.m. and 8:00 a.m., they discovered, and, within approximately five minutes, dislodged, a grease blockage in the sewer line between the lift stationand Dixon's home. It denies that the red light was activated at the lift station when its personnel arrived. The Board asserts that the Williams plant noted a SCADA alarm between 7:51 a.m. and 8:01 a.m., but insists that it sounded only because the pumps at the lift station were momentarily overwhelmed by the resumed flow of sewage that had accumulated behind the grease blockage.
 III. Discussion
The Board states: "[T]he evidence is undisputed that the backup was caused by a grease blockage in the sewer line leading to the lift station." Appellee's Brief, at 4 (emphasis in original). This view of the evidence is demonstrably erroneous. Obviously, the parties' theories of causation differ widely. Indeed, a material issue in this case is whether the damage to Dixon's home resulted from a grease blockage between the lift station and Dixon's house, or from a problem at the lift station to which the Board failed to respond adequately. "`[I]t is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence.'" Norris v. City of Montgomery, 821 So.2d 149, 155 n. 8 (Ala. 2001) (quoting Lemond Constr. Co. v. Wheeler, 669 So.2d 855, 862 (Ala. 1995)). Viewing the evidence in the light most favorable to Dixon, the nonmovant — as we are required to do, Renfro v. Georgia Power Co.,604 So.2d 408, 411 (Ala. 1992) — we conclude that she presented substantial evidence in support of her theory that the backup was caused by a sewer-system malfunction at the lift station.
Dixon testified unequivocally that the red light was activated at the lift station by 7:00 a.m., nearly an hour before the Board's personnel arrived. It was uncontroverted that a grease blockage in the line above
the lift station would not activate the red light, and that an activated red light indicates a problem with the lift station. *Page 1166 
Thus, Dixon's testimony directly contradicts the Board's theory of causation.[2]
From the testimony of Dixon and her expert witness, it could be inferred that the water exceeded the preset high-water level in the wet well, triggering the alarm at the Williams plant at or before 7:00 a.m., that is, before Dixon's home was entirely flooded with raw sewage. The Board does not allege that the alarm was inoperable on the morning of the incident. On the contrary, deposition testimony presented by the Board demonstrates that the alarm system was functioning on that morning. Thus, it could further be inferred that the Board failed to respond to the alarm in a reasonable time and in a manner calculated to prevent the discharge of sewage into Dixon's house, considering the location of the lift station in relation to Dixon's home. Of course, a jury will be free to reject any or all of the evidence necessary to establish Dixon's theory of the case. That it may do so, however, is of no moment at this stage of these proceedings.
In this connection, the trial court, in response to the Board's motion to strike the affidavit testimony of Charles Peterson, rejected Peterson's testimony, stating in its order that Peterson had "not reviewed any depositions or other material documents and evidence in this case" and that Peterson's "opinions appear to amount to nothing more than speculation and conjecture." In doing so, the trial court erred.
To be sure, the opinions of an expert witness may not rest on "mere speculation and conjecture." Townsend v. General Motors Corp.,642 So.2d 411, 423 (Ala. 1994). However, a theory of causation is not mere conjecture, when it is deducible as a reasonable inference from "known facts or conditions," Alabama Power Co. v. Robinson, 447 So.2d 148,153-54 (Ala. 1983). "`[I]f there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.'" Griffin Lumber Co. v. Harper, 247 Ala. 616, 621, 25 So.2d 505,509 (1946) (quoting Southern Ry. v. Dickson, 211 Ala. 481, 486,100 So. 665, 669 (1924)).
If the jury should find Dixon's testimony credible, that is, if it believes that the red light at the lift station was on at approximately 7:00 a.m., then Peterson's theory of causation is logically deducible, based on his review of the evidence material to Dixon's theory of the case. Indeed, the depositions of the Board's employees and the SCADA records they produced are particularly material to the Board's case, not to Dixon's. For Dixon's case, it was essential for Peterson to establish his knowledge of the lift station, and its construction, operation, and location, in relation to the Board's system, to the Williams plant, and to Dixon's house, in particular. He did so through his review of the "construction plans for the subject lift station and the sanitary sewer system." Moreover, Peterson's opinion does not conflict with the testimony of the Board's personnel, insofar as it relates to the operation of the red light at the lift station and the alarm system at the Williams plant.
We reiterate that a material question is whether the red light was activated at the *Page 1167 
lift station before the Board's personnel arrived. It is peculiarly the function of the jury to resolve such conflicts in the evidence as exist in this case. For these reasons, the trial court erred in entering a summary judgment for the Board. Therefore, the judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and HOUSTON, LYONS, and JOHNSTONE, JJ., concur.
[1] SCADA is an acronym for "supervisory control and data acquisition."
[2] It goes without saying that "`"a court may not determine the credibility of witnesses on a motion for summary judgment."'" Wilson v.Teng, 786 So.2d 485, 498 (Ala. 2000) (quoting Ex parte Usrey, 777 So.2d 66,68 (Ala. 2000), quoting in turn Phillips v. Wayne's Pest Control Co.,623 So.2d 1099, 1102 (Ala. 1993)).