SMITH, Justice
(concurring specially).
I concur in the Court’s decision to affirm without opinion the summary judgment entered in favor of Dr. William H. Johnston, Jr., and Birmingham Pediatric Associates, Inc. (“Birmingham Pediatric”),[1] in the action filed by Greg Groover and Melinda Groover, as parents and next friends of Lennon Groover, a minor. As discussed in Part I below, an opinion is not warranted in this case because of the Groovers’ failure to comply with Rule 28(a), Ala. R.App. P. In light of the issues raised by Chief Justice Cobb’s dissenting opinion, however, I write specially to explain why, even had the Groovers complied with Rule 28(a), a reversal of the summary judgment entered against them is not appropriate.

I.

The specific breaches of the standard of care alleged by the Groovers are (1) that Dr. Johnston negligently failed to recognize Lennon’s developmental delays and to refer him to an appropriate specialist in a timely manner; and (2) that Dr. Johnston negligently failed to communicate with Dr. Holly Mussell “regarding Lennon’s condition and their respective treatment.” Gro-overs’ brief, p. 26. The Groovers contend that those alleged breaches of the standard of care caused Lennon to suffer permanent brain injuries. As they did in the trial court, the Groovers on appeal rely exclusively upon the deposition testimony of Dr. Daniel Adler and the affidavit of Dr. Steven Shore, the Groovers’ expert witnesses, to support those allegations.
The trial court found that the deposition testimony of Dr. Adler and the affidavit of Dr. Shore were not substantial evidence indicating that the alleged negligence of Dr. Johnston probably caused Lennon’s injury — i.e., irreversible brain damage. The trial court’s order granting the Johnston defendants’ summary-judgment motion states:
*34 “Dr. Shore avers the following in his affidavit:
“ ‘William H. Johnston, MD, breached the standard of care by failing to recognize Lennon Groover’s developmental delays and refer the child out to qualified specialists in a timely manner.
“‘Dr. William H. Johnston’s delay in sending the child to a qualified hematologist or other specialist resulted in the child’s macrocytic anemia being undiagnosed for at least an additional six (6) months. During that period the child did not receive the necessary medical treatment resulting in his condition further deteriorating.’
“The Court has reviewed the deposition testimony of Dr. Adler. However, it appears to the Court that Dr. Adler, a pediatric neurologist, was deposed in order to elicit testimony regarding the standard of care, and the breach of the standard of care in the treatment provided by Defendant Holly Mussell, the pediatric neurologist in this case. Dr. Adler offered no opinion with regard to the applicable standard of care to which a pediatrician, such as Dr. Johnston, is to comply, nor whether Dr. Johnston breached the standard of care in providing pediatric health services to Plaintiffs’ minor, Lennon Groover. Dr. Adler, however, did offer testimony with regard to the element of causation. Specifically, he testified as follows:
“ ‘... I agreed that B-12 deficiency appearing after birth was a substantive cause of this boy’s neurological disability, that the neurological disability was permanent, and that there was an opportunity to prevent the injury had the B-12 administration commenced earlier, considering the way the boy was being fed.’
“Dr. Adler testified that plaintiffs’ minor developed symptoms of B-12 deficiency between 9 to 12 months after his birth. He further testified that by mid-2001 it was clear that Lennon was not developing well and by the summer of 2001, he reached a level of B-12 deficiency to the point that he became brain injured from it. Dr. Adler stated that though Plaintiffs’ minor was not B-12 deficient during pregnancy nor during the first year of his life, that the condition developed over time and the symptoms did not show suddenly, [but] through a process of poor developmental evolution of the child. Adler testified that Plaintiffs’ minor had irreversible brain damage for 4-6 weeks prior to September 7, 2001, the date on which Dr. Mussell became aware of the results of the MRI conducted in August of 2001. He testified that the brain injury occurred by mid-July to early August 2001. Dr. Adler testified that had Plaintiffs’ minor been diagnosed and treated earlier than he actually was, that he would have had an opportunity ‘to be better than he is[.’] [H]owever, when asked to quantify that opinion, Dr. Adler testified, T can’t tell you how much better.’
[[Image here]]
“The Court finds that Dr. Shore is a qualified similarly situated health care provider with Defendant Johnston. The Court further finds that Dr. Shore’s affidavit is sufficient to create a genuine dispute of material fact with regard to the issues of the standard of care to which board certified pediatricians are held, and with regard to the issue of whether or not Defendant Johnston breached the said standard of care.
“However, on the issue of causation, for which expert testimony is required in order to create a genuine dispute of material fact, Dr. Shore’s affidavit states *35 that the delay in referring Plaintiffs’ minor son to a specialist rendered his condition undiagnosed and untreated for an extended period of time ‘resulting in his condition further deteriorating.’
“Dr. Adler’s deposition testimony, cited hereinabove, expands on this statement in arriving at the same conclusion that the brain damage had commenced prior to the time that it should have been discovered by Defendant Johnston, and that the delay in treatment and diagnosis meant that Plaintiffs’ minor son suffered a further, though unquantifiable, deterioration in his health as a result.”
(Footnotes omitted.)
The trial court found this case to be controlled by McAfee v. Baptist Medical Center, 641 So.2d 265, 267-68 (Ala.1994), and the trial court’s order quotes extensively from McAfee, including most of the following:
“If, as the defendants suggest, the plaintiffs are in fact asking this Court to abandon Alabama’s traditional rules of proximate cause and to recognize the ‘loss of chance doctrine,’ we decline to do so. Alabama law requires that a recovery not be based upon a mere possibility:
“‘The rule in Alabama in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury. Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87 (1958).’
“Baker v. Chastain, 389 So.2d 932, 934 (Ala.1980).
“The plaintiffs cite us to Parker v. Collins, 605 So.2d 824 (Ala.1992), wherein we stated:
“ ‘This Court has previously held that the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care. Waddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974); Murdoch v. Thomas, 404 So.2d 580 (Ala.1981). It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence. Waddell; see also Annot. 54 A.L.R.4th 10 § 3 (1987).’
“Id. at 827. We do not read Parker as abrogating the rule that the plaintiff must prove that the physician’s negligence probably caused the injury. In Parker, we reversed a judgment based on a directed verdict for the defendant physician on the grounds that the ‘medical testimony suggests that Mrs. Parker’s condition worsened as a direct result of a diagnosis based upon a substandard X-ray,’ stating, ‘That evidence was sufficient to create a jury question as to proximate cause in this case.... ’ 605 So.2d at 827 (Emphasis added.) In Parker, a cancer specialist testified that he was 80% certain that the cancer had not spread into the lymph nodes at the time of the improper diagnosis. Thus, there was expert testimony from which the jury could infer that the physician’s negligence probably caused her injury.
“We have carefully studied the record in each of the eases before us and in both cases we conclude that the defendants made a prima facie showing that they were entitled to a judgment as a matter of law on the issue of causation by producing evidence that their actions did not cause the patient’s condition to *36 worsen. In neither case did the plaintiffs submit substantial evidence that the patient’s condition worsened as a direct result of the actions of the defendant physicians.
“In the first case, the baby, Martin McAfee, contracted meningitis from bacteria. He was treated by Dr. Rodney Dorand. Dr. Dorand, a board certified neonatologist, submitted an affidavit stating that he was familiar with the degree of care, skill, and diligence normally exercised by physicians practicing neonatology in 1990, and that, in his opinion, nothing he did or did not do in his care and treatment of Martin McAf-ee probably caused or contributed to cause any injury. The affidavit of the plaintiffs’ expert, Dr. O. Carter Snead III, offered a conjectural observation that, generally, the sooner the onset of treatment, the better the expected result. There is no evidence that the actions of Dr. Dorand or those of Dr. Gillis Payne, who first saw the baby, probably caused the poor outcome. In the second case, the plaintiffs submitted affidavits stating, generally, that ‘time is of the essence’ in treating breast cancer, and that patients who receive earlier treatment obtain a better result. There was no expert testimony to rebut the testimony submitted by the defendants indicating that the metastasis to the lymph nodes probably occurred in the early stages before the cancer could be diagnosed. The affidavits of the plaintiffs’ experts did not rise to the level of substantial evidence that the actions of the defendants probably caused Brenda Roberts’s injuries.
“The summary judgment in each case is due to be affirmed on the authority of McKinnon v. Polk, 219 Ala. 167, 121 So. 539 (1929); Peden v. Ashmore, 554 So.2d 1010 (Ala.1989); Sasser v. Connery, 565 So.2d 50 (Ala.1990); Smith v. Medical Center East, 585 So.2d 1325 (Ala.1991); Parker v. Collins, 605 So.2d 824 (Ala.1992); and Levesque v. Regional Medical Center, 612 So.2d 445 (Ala.1993).”
McAfee, 641 So.2d at 267-68 (footnotes omitted; some emphasis added).
The trial court concluded that the expert testimony offered in Dr. Shore’s affidavit and Dr. Adler’s deposition was
“not sufficient to create a genuine dispute of material fact that the alleged breach of the standard of care probably caused the irreversible brain damage in [Lennon]. Parker v. Collins, [605 So.2d 824 (Ala.1992) ], which could serve as authority for the proposition that the causation testimony before the Court is substantial evidence creating a genuine dispute of material fact, has not been so interpreted by the Alabama Supreme Court.”
In their materials to this Court, the Groovers do not cite any authority to demonstrate that the trial court’s analysis and conclusion as to causation are incorrect. Even though the trial court cited both McAfee and Parker v. Collins, 605 So.2d 824 (Ala.1992), in its order and the Johnston defendants discuss both McAfee and Parker in their brief to this Court, the Groovers in their briefs to this Court do not address either McAfee or Parker. The Groovers’ entire argument regarding the issue of causation is as follows:
“C. Causation
“Dr. Adler testified that Lennon’s B-12 deficiency most likely developed around 12 months of age (Adler dep. 64). Dr. Adler pointed out that Lennon could sit up at 9 months, but could not walk until after 19 months (Adler dep. 64). Dr. Adler explained his timeline for Lennon’s B-12 deficiency as follows:
“ T think that this baby was born with adequate stores of B-12. He was *37 normal at birth. All notes about him early in life were that he was thriving and doing well. I think that his nutritional deficiencies — and, again, speaking as a pediatric neurologist — were such that from the fact that he wasn’t eating anything and he was only being breast-fed were not only vitamin B-12 deficiency, which, of course, we learned later, but much earlier we seemed to have iron deficiency that’s described in the records. Iron supplementation is commenced. That’s at about a year of age. So my feeling is that there was more likely than not a combination, and that the problems with B-12 that ultimately produced more, you know, significant problems began really after a few more months of continued vitamin B-12 deficiency.’
“(Adler dep. 65-66).
“Dr. Adler explained the progression of Lennon’s injuries from the B-12 deficiency as follows:
“ ‘I think he had a degree of white matter injury based on the imaging abnormalities. That must have been at least four to six weeks old, because he’s talking about a diminution in the volume of the white matter. So since B-12 is involved in myelin production, its absence leads to injury in myelin producing cells.
“ ‘So first you get injury. You would see it on specific abnormalities. And then whatever those cells are, since they can’t survive metabolically— since they have a metabolic injury, they can’t survive. Then they shrink after a while. And that takes time to develop.
[[Image here]]
“ ‘There was already a loss of volume in the brain that was caused by chronic vitamin B-12 deficiency, so that the imaging in August [2001] was abnormal. And I think even B-12 administration at that point would have still-would not have permitted this boy to be normal.
“ ‘Q. He had permanent brain injuries by that point in time that were going to cause him to have developmental delays and other issues that occur from brain injury, correct?
“ ‘A. True.
“ ‘Q. And that condition had existed, in your opinion, at least four to six weeks by the time that MRI was performed, correct?
“ ‘A. Correct.
“ ‘Q. Which would point the injuries to these permanent injuries to Lennon occurring by mid-July to early August, correct?
“ ‘A. True.’
“(Adler dep. 70-71). -
“When asked if any other birth defects or problems contributed to Lennon’s injuries, Dr. Adler testified, ‘there’s no other diagnosis in the records that I can see, other than B-12 deficiency.’ (Adler dep. 80). Again, Dr. Adler states that Lennon’s records show no other causes for his injuries other than the B-12 deficiency (Adler dep. 82-83). Dr. Adler dismissed Dr. Johnston’s earlier reliance on an iron deficiency or iron anemia because the low iron would not cause the white brain matter decrease that the B-12 deficiency caused in Lennon (Adler dep. 83).”
(Groovers’ brief, pp. 27-29.)
Thus, the portions of the Groovers’ initial brief and reply brief addressing causation cite no legal authority whatsoever. Even though the trial court’s summary-judgment order relied on Dr. Adler’s testimony that he could not quantify “how much better” Lennon would have been if he had been diagnosed and treated earlier *38 than he actually was, the Groovers do not address the effect of Dr. Adler’s inability to quantify the degree of deterioration in Lennon’s condition allocable to the delay in treatment allegedly caused by Dr. Johnston’s breach of the standard of the care.
In a section of their brief that precedes the section addressing causation, the Groovers cite Looney v. Davis, 721 So.2d 152, 157 (Ala.1998), for its recitation of the elements of a medical-malpractice action and its statement that “[t]he plaintiff in a medical malpractice action generally must establish the prima facie elements by introducing expert testimony.” Groovers’ brief, p. 25. The dissent concludes that that lone citation provides sufficient legal justification on which to reverse the summary judgment in this case. The dissent notes:
“The Groovers’ brief is certainly sufficient to apprise the Court of the Gro-overs’ argument and to allow the Court to evaluate the legal merits of the Gro-overs’ position. The Groovers clearly rely on the well recognized principle of law, also relied upon by the Johnston defendants, that causation is an element of a medical-malpractice action. The only issue before us is whether proof of causation exists; therefore, no further citation to legal authority is necessary. The Groovers also cite legal authority to the effect that causation is generally established by the testimony of a medical expert.”
Groover v. Johnston, 39 So.3d at 55 (Cobb, C.J., dissenting). I disagree.
In Horn v. Fadal Machining Centers, LLC, 972 So.2d 63, 80 (Ala.2007), this Court noted:
“Horn cites no legal authority relevant .to her negligent-maintenance theory.
“ ‘Rule 28(a)(10), Ala. R.App. P., requires that arguments in an appellant’s ... brief contain “citations to the cases, statutes, other authorities, and parts of the record relied on.” The effect of a failure to comply with Rule 28(a)(10) is well established:
“‘“It is settled that a failure to comply with the requirements of Rule 28(a)( [10]) requiring citation of authority for arguments provides the Court with a basis for disregarding those arguments:
“““When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research. Rule 28(a) ([10]); Spradlin v. Birmingham Airport Authority, 613 So.2d 347 (Ala.1993).’
“ ‘ “City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998). See also McLemore v. Fleming, 604 So.2d 353 (Ala.1992); Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251 (Ala.1985); and Ex parte Riley, 464 So.2d 92 (Ala.1985).”
“ ‘Ex parte Showers, 812 So.2d 277, 281 (Ala.2001). “[W]e cannot create legal arguments for a party based on undelineated general propositions unsupported by authority or argument.” Spradlin v. Spradlin, 601 So.2d 76, 79 (Ala.1992).’
“University of South Alabama v. Progressive Ins. Co., 904 So.2d 1242, 1247-48 (Ala.2004).
“ ‘Authority supporting only “general propositions of law” does not constitute a sufficient argument for reversal. ’ Beachcroft Props., LLP v. City of Alabaster, 901 So.2d 703, 708 (Ala.2004) (quoting Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)).
*39 ‘ “[W]here no legal authority is cited or argued, the effect is the same as if no argument had been made.” ’ Steele v. Rosenfeld, LLC, 936 So.2d 488, 493 (Ala.2005) (quoting Bennett v. Bennett, 506 So.2d 1021, 1023 (Ala.Civ.App.1987) (emphasis in Steele)). Because Horn has cited no legal authority specific to her negligent-maintenance claim, she has not presented an argument sufficient for reversal of the judgment on that claim. The judgment in favor of Cardinal is, therefore, affirmed as to the negligent-maintenance claim.”
Horn, 972 So.2d at 80 (some emphasis added).
Under Horn, the effect of the Groovers’ failure to cite any legal authority specific to their theory of causation “ ‘is the same as if no argument had been made.’” Horn, 972 So.2d at 80 (quoting Steele, 936 So.2d at 493). Consequently, as to the issue of causation, the Groovers have “not presented an argument sufficient for. reversal of the judgment.” Horn, 972 So.2d at 80.[2]

II.

For the reasons stated in Part I, a reversal is not warranted in the present case. But even apart from the Groovers’ failure to present sufficient legal argument to warrant a reversal, summary judgment in favor of the Johnston defendants nevertheless was proper on the merits. Among other things, the Johnston defendants cite McAfee, supra, to support their argument that the Groovers did not offer substantial evidence of causation and that they may
not recover for any “loss of a chance” to obtain a better medical outcome.[3]
As noted, the trial court found this case to be controlled by McAfee and concluded that the expert testimony offered by the Groovers was “not sufficient to create a genuine dispute of material fact that the alleged breach of the. standard of care probably caused the irreversible brain damage in [Lennon].” I agree.
According to the Groovers’ expert, Dr. Daniel Adler, a pediatric neurologist, a vitamin B-12- deficiency caused Lennon to suffer permanent,' irreversible brain injuries by mid-July or early August 2001. The Groovers do not contend that any negligence by the Johnston defendants probably caused Lennon to suffer the B-12 deficiency. Rather, the Groovers’ contention- is that if Dr. Johnston had made a timely referral to an appropriate specialist, “further deterioration” of Lennon’s condition could have been avoided or lessened.
Notably, however, Dr. Adler’s testimony does not state that an earlier diagnosis of the B-12 deficiency or earlier referral by Dr. Johnston or anyone else would have resulted in a quantifiably different outcome for Lennon. Specifically, as the trial court noted, “Dr. Adler testified that had Plaintiffs’ minor been diagnosed and treated earlier than he actually was, ... he would have had an opportunity ‘to be better than he is[.’] [HJowever, when asked to quantify that opinion, Dr. Adler testified, T can’t tell you how much better.’ ”
Dr. Adler admitted that the sole basis for his opinion in this ease was the general *40 medical premise that the earlier a condition is treated, the better the outcome. Specifically, he testified:
“Q. Do you agree that that opinion— that he would be better with an earlier diagnosis — knowing that it’s already your opinion that he would have already had permanent neurological injuries by that time ... requires you to speculate?
“A. I don’t think it is speculation to say that when you have an ongoing process that produces injury to the brain or leads to injury to the brain and as it continues that the injury — or the effects of that injury worsens. But I’m not able to tell you how much worse it would be, just that he would be better.
“Q. Is that just based on some general concept of the sooner you treat a condition, the better the outcome, generally?
“A. I mean, that’s a general and accepted rule in medicine.
[[Image here]]
“A. I would say he would be better, but after that I don’t have an opinion.
“Q. You just say he would be better, but you can’t quantify that in any way, correct?
“A. Correct.”
Thus, the basis for Dr. Adler’s testimony — the general premise that the earlier a condition is treated, the better the outcome — is identical to that of the expert testimony held insufficient in McAfee.
In their reply brief, the Groovers assert that “Dr. Adler testified that Lennon’s injuries could have been prevented if B-12 had been administered earlier.” Presumably, the testimony to which the Groovers are referring is the following:
“I agreed that B-12 deficiency appearing after birth was a substantive cause of this boy’s neurological disability, that the neurological disability was permanent, and that there was an opportunity to prevent the injury had the B-12 administration commenced earlier, considering the way the boy was being fed.”
Dr. Adler’s testimony in that regard, however, was specifically addressed by the trial court’s order. Again, that testimony is stated generically and does not assert with any specificity how much earlier the diagnosis needed to be made in order to result in a different outcome.[4] As the trial court noted and as I have noted above, when Dr. Adler was asked to “quantify his opinion” as to how much better Lennon would be if his B-12 deficiency had been diagnosed earlier than it was, Dr. Adler testified, “I can’t tell you how much better.” [5] Under McAfee, Dr. Adler’s testimony is not sufficient to serve as substantial evidence of causation.
*41 Dr. Adler’s testimony that the already permanent brain injury worsened in an unquantifiable way after the “summer of 2001,” as well as his testimony that an earlier diagnosis would have resulted in “an opportunity [for Lennon] ‘to be better than he is,’ ” is conclusory, speculative, and without basis. This Court has held that “evidence which affords nothing more than speculation, conjecture, or guess” is not sufficient to warrant the submission of an issue to the jury, and if the “evidence is equally consistent with either the existence or nonexistence of negligence, the issue should not be submitted to the jury.” Watterson v. Conwell, 258 Ala. 180, 183, 61 So.2d 690, 692 (1952).
In addition to Dr. Adler’s testimony, the Groovers offered an affidavit from Dr. Steven Shore, a pediatrician. Regarding that affidavit, the dissent asserts that “Dr. Shore certainly did testify that Dr. Johnston’s negligence ‘resulted] in [Lennon’s] condition further deteriorating ’ — i.e., that Lennon’s injuries were worse than they otherwise would have been in the absence of Dr. Johnston’s negligence.” 39 So.3d at 50 (Cobb, C.J., dissenting). The dissent concludes that Dr. Shore’s affidavit testimony makes this ca'se sufficiently analogous to the following situation recognized in McAfee:
“ ‘This Court has previously held that the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care. Waddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974); Murdoch v. Thomas, 404 So.2d 580 (Ala.1981). It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence. Waddell; see also Annot. 54 A.L.R.4th 10 § 3 (1987).’”
McAfee, 641 So.2d at 267 (quoting Parker v. Collins, 605 So.2d 824, 827 (Ala.1992)).
Dr. Shore’s affidavit, however, does not state “that Lennon’s injuries were worse than they otherwise would have been in the absence of Dr. Johnston’s negligence.” Dr. Shore’s affidavit states specifically that:
“4. William H. Johnston, M.D., breached the standard of care by failing to recognize Lennon Groover’s developmental delays and refer the child out to qualified specialists in a timely manner.
“5. Dr. William H. Johnston’s delay in sending the child to a qualified hematologist or other specialist resulted in the child’s macrocytic anemia being undiagnosed for at least an additional six (6) months. During that period the child did not receive the necessary medical treatment respiting in his condition further deteriorating.”
Thus, Dr. Shore’s affidavit asserts (1) that Dr. Johnston should have referred Lennon to a specialist earlier than he did and (2) that Lennon’s failure to receive the necessary medical treatment resulted in his condition further deteriorating. .However, Dr. Shore’s affidavit does not provide a basis for inferring that (1) caused (2). In other words, Dr. Shore’s affidavit provides 'no basis for inferring that if Dr. Johnston had made a timely referral to a specialist — i.e., if Dr. Johnston had not acted negligently — Lennon probably would have received “the necessary medical treatment” to which Dr. Shore referred.
The dissent finds Dr. Shore’s affidavit sufficient because, the dissent asserts, Dr. Shore “opines that the purportedly negligent delay in treatment actually ‘result[ed] in’ a real physical injury: ‘the deterioration of [Lennon’s] condition’ ” 39 So.3d at *42 50 (Cobb, C.J., dissenting) (first emphasis added). However, as noted, it is undisputed that the B-12 deficiency was the cause of Lennon’s injuries. Neither Dr. Shore nor Dr. Adler testified that Dr. Johnston had a duty to diagnose and treat the B-12 deficiency,[6] Rather, Dr. Shore asserted that Dr. Johnston “breached the standard of care by failing to recognize Lennon Groover’s developmental delays and refer the child out to qualified specialists in a timely manner” (emphasis added).
Thus, for Dr. Johnston to comply with the standard of care set forth by Dr. Shore, Dr. Johnston needed to (1) recognize Lennon’s developmental delays (not recognize the B-12 deficiency) at an earlier time and (2) refer Lennon to “qualified specialists” (not treat the B-12 deficiency). If Dr. Johnston had done those two things, then there are two possibilities: (1) the “qualified specialists” would have diagnosed and treated the B-12 deficiency, thereby preventing or lessening any additional injury that Lennon sustained; or (2) the “qualified specialists” would not have diagnosed and treated the B-12 deficiency, and thus the B-12 deficiency would continue to injure Lennon. In other words, an earlier referral could have possibly resulted in an earlier diagnosis and treatment, which could have possibly prevented or reduced additional injury to Lennon. Without stating who the “qualified specialists” should have been or what the probable diagnosis, treatment, and result of any such referral would have been, Dr. Shore’s opinion assumes that “qualified specialists” probably would have diagnosed and treated the B-12 deficiency and that the treatment would have prevented Lennon’s condition from “further deteriorating.” But there is nothing in Dr. Shore’s affidavit to support that conclusion, and the Groovers do not cite any other evidence in the record to support it.[7] Thus, Dr. Shore’s assumption that an earlier referral to a “qualified specialist” would have prevented or lessened the “further deterioration” of Lennon’s condition is conelusory, speculative, and without a proper evidentiary foundation and cannot create a genuine issue of material fact. See Bradley v. Miller, 878 So.2d 262, 266 (Ala.2003), in which this Court noted:
“ ‘To prove causation in a medical malpractice case, the plaintiff must prove, through expert medical testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.’
“University of Alabama Health Servs. v. Bush, 638 So.2d 794, 802 (Ala.1994). ‘[T]he opinions of an expert may not rest on “mere speculation and conjecture.” Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala.1994).’ Dixon v. Board of Water & Sewer, Comm’rs of Mobile, 865 So.2d 1161, 1166 (Ala.2003). ‘[A]s a theory of causation, a conjecture is simply an explanation consistent with known facts.or conditions, but not deducible from them as a reasonable inference. See, e.g., Griffin Lumber Co. v. Harper, 247 Ala. 616, 25 So.2d 505 (1946).’ Alabama Power Co. v. Robin *43 son, 447 So.2d 148, 158-54 (Ala.1983). An expert witness’s opinion that is conclusory, speculative, and without a proper evidentiary foundation cannot create a genuine issue of material fact. Becton v. Rhone-Poulenc, Inc., 706 So.2d 1134, 1141-42 (Ala.1997).”
As noted, the dissent concludes that McAfee is inapposite and, presumably, that this case is more analogous to Parker, supra. This case is distinguishable from Parker, however.
Parker involved a claim that in January 1988 Dr. Wyatt E. Collins, a radiologist, “negligently performed a mammogram upon Mrs. Parker and that he then negligently interpreted the test results to be negative” for breast cancer. Parker was diagnosed with breast cancer in December 1988; by that time the cancer had spread to her lymph nodes. 605 So.2d at' 826.
The Parkers presented testimony from two experts indicating that the X-ray film used by. Dr. Collins was “ ‘grossly technically inadequate and suboptimal for interpretation’ and that Dr. Collins violated the accepted standard of radiology care by basing his diagnosis upon it.” 605 So.2d at 826. In addition to that testimony about the failure to diagnose,,
“Dr. Nicholas Robert, a cancer specialist, testified ... as to the effect of the delay in diagnosing Mrs. Parker’s condition. Based on the evidence regarding the size of the lump discovered by Mrs. Parker in-January, as'well as the medical evidence surrounding the subsequent growth of the lump, Dr. Robert said that he was 80% certain that the cancer had not spread into Mrs. Parker’s lymph nodes as of January. Dr. Sanchez, Mrs. Parker’s surgeon, then testified that Mrs. Parker’s mastectomy and the course of chemotherapy and radiation' treatments that followed were necessary, because the cancer had spread into her lymph nodes. He also testified that breast cancer has a higher rate of recurrence once it has spread into the lymph glands.”
605 So.2d at 826 (emphasis added).[8]
Thus, unlike Dr. Shore’s opinion in this case regarding the effect of the alleged negligent failure of Dr. Johnston to timely refer Lennon to a qualified specialist, there was proper expert testimony in Parker as to the probable effect of the failure to diagnose: for example, the failure to diagnose probably caused Parker to undergo additional medical treatments — a mastectomy and the course of chemotherapy and radiation treatments — and caused her to suffer the additional injury of having a higher chance of reoccurrence of breast cancer than she otherwise would have had. In other words, the plaintiffs in Parker presented testimony by a qualified expert with a proper evidentiary foundation indicating that if the defendant physician had not acted negligently, the patient probably would have had a better outcome.[9] Conse *44 quently, unlike the present case, there was substantial evidence of causation in Parker.
As noted, the Groovers’ theory of causation in this case is that (1) if Dr. Johnston had recognized Lennon’s developmental delays at an earlier stage and (2) if Dr. Johnston had referred Lennon to “qualified specialists,” then (3) the “qualified specialists” would have properly diagnosed and treated Lennon’s B-12 deficiency, and (4) Lennon’s condition would not have “further deteriorated.” For the reasons stated, the expert testimony offered by the Groovers in support of their theory of causation was insufficient to avoid being described as mere conjecture. Additionally, the Groovers have not cited legal authority suggesting that their theory of causation and the evidence offered in support of it are sufficient to warrant a reversal of the summary judgment.

Ill

In light of the foregoing discussion about the Groovers’ failure to offer substantial evidence of causation, it should be noted that the Groovers argue on appeal that “[t]he trial court erred by entering summary judgment before the Groovers completed discovery in compliance with the trial court’s scheduling order.” Gro-overs’ brief, p. 15. The Groovers’ argument in that regard includes two parts. First, the Groovers contend that they were not given enough time to depose their expert, Dr. Shore. Second, the Groovers argue that the issue of causation was not properly before the trial court on the Johnston defendants’ motion for a summary judgment.
When the Groovers filed their complaint on March 31, 2006, they also filed a motion for the entry of a scheduling order, requesting, among other things, the following: (1) that all fact witnesses be deposed within 90 days of the date of filing of the last answer; (2) that all the Groovers’ experts be identified within 90 days of the date of the last answer filed and that all of those experts would be made available for deposition within 120 days of the date of filing of the last answer; and (3) that the court hold a pretrial conference and set the case for trial within 200 days of the date the last answer was filed.
On September 1, 2006, the trial court entered a scheduling order. That order gave the Groovers until January 31, 2007, to identify experts; until March 30, 2007, to put those experts up for deposition; and until July 31, 2007, to complete all other depositions. The order set the case for trial on October 1, 2007. On January 31, 2007, the Groovers filed curriculum vitae of a number of purported experts, including Dr. Shore and Dr. Adler.
On February 22, 2007, the trial court amended its scheduling order to extend several deadlines, including extending the deadline for deposing the Groovers’ experts from March 30, 2007, until May 31, 2007. The defendants deposed Dr. Adler in New York on March 23, 2007.
On June 1, 2007, counsel for the Gro-overs moved to withdraw from representing the Groovers. The trial court granted the motion and allowed the Groovers until July 23, 2007, to secure new counsel. On July 13, 2007, the Johnston defendants moved for a summary judgment based on: (1) the affidavit of Dr. Johnston which asserts that Dr. Johnston met the stan *45 dard of care in his treatment of Lennon and that no act or omission on his part “proximately caused harm to Lennon”; and (2) the fact that the May 31, 2007, deadline had passed without the Groovers’ identifying and putting up for deposition any similarly situated expert to testify that Dr. Johnston breached the standard of care in his care of Lennon.
At a status conference on July 23, 2007, new counsel appeared for the Groovers and requested additional time to conduct discovery and to respond to the pending summary-judgment motion. The trial court entered an order granting the Gro-overs additional time — until October 1, 2007 — to identify and submit affidavits from any expert witness needed to respond to the pending summary-judgment motion. The order set the case for another status conference on October 1, 2007. The trial court entered an additional scheduling order on October 3, 2007, continuing the hearing on the pending summary-judgment motion until January 10, 2008. The court also gave the Johnston defendants until December 31, 2008, to file additional evidentiary submissions and gave the Groovers until January 8, 2008, to file additional evidentiary submissions.
The Groovers did not file additional evi-dentiary submissions by the January 8, 2008, deadline. On January 10, 2008, the Johnston defendants filed a supplemental brief stating that the Groovers had not submitted any further evidence by the January 8, 2008, deadline and that the Groovers had not submitted sufficient evidence of causation.
The trial court held the scheduled hearing on the summary-judgment motion on January 10, 2008. At that hearing, the Groovers requested and were granted an additional 10 days in which to file a reply brief in response to the Johnston defendants’ supplemental brief filed on January 10, 2008. Following the hearing, the Gro-overs filed a motion to strike the Johnston defendants’ supplemental brief. The Johnston defendants responded in a written brief, arguing that the supplemental brief could not have been submitted until after the January 8 deadline passed -with no further evidentiary submissions from the Groovers. The Johnston defendants also argued that causation was not a new issue because, they contended, it had been raised in Dr. Johnston’s affidavit filed along with the Johnston defendants’ original summary-judgment motion.
On January 29, 2008, the trial court denied the Groovers’ motion to strike the supplemental brief, and the court granted the Johnston defendants’ motion for a summary judgment. The court’s order specifically stated that the Groovers had not offered substantial evidence indicating that the alleged breach of care by Dr. Johnston was the proximate cause of Lennon’s injuries.
As to their argument to this Court that they were not given enough time to depose their expert, Dr. Shore, the Groovers did not raise this argument below; they did not inform the trial court that they needed additional time to depose their expert, Dr. Shore. The Johnston defendants point out that after the filing of their summary-judgment motion in July 2007, the Gro-overs were given an additional six months — until January 8, 2008 — in which to file evidentiary submissions in support of their claims. The Johnston defendants also assert that the Groovers “certainly did not need to depose Dr. Shore to place his opinions before the trial court since they had direct access to their own expert and could obtain an affidavit from him setting forth his opinions in whatever amount of detail they deemed appropriate.” The Johnston defendants’ brief, pp. 37-38. Thus, the Groovers’ argument that they *46 were not allowed sufficient time to depose Dr. Shore is without merit.
Regarding the Groovers’ argument that the issue of causation was not properly before the trial court, the trial court’s order addressed that argument and held that the Johnston defendants’ July 2007 summary-judgment motion, which was accompanied by Dr. Johnston’s affidavit asserting that nothing he did or did not do “proximately caused harm to Lennon Groover,” shifted the burden of proof to the Groovers on the issue of causation. Thus, contrary to the Groovers’ contention, the Johnston defendants did not wait until January 2008 to raise the issue of causation for the first time. Indeed, the Groovers’ argument that the July 2007 summary-judgment motion did not raise the issue of causation is contradicted by the Groovers’ response to that motion, filed September 28, 2007, in which the Groovers asserted that they “have been in contact with other experts who they expect to identify. These experts will offer additional evidence regarding the cause and extent of the child’s injuries” (emphasis added). Consequently, the Groovers’ argument that the Johnston defendants’ July 2007 summary-judgment motion did not raise the issue of causation is without merit.
Finally, the Groovers’ argument that the trial court erred in permitting the Johnston defendants to file a supplemental brief is also without merit. Although the Johnston defendants’ supplemental brief filed on January 10, 2008, argued that Groovers had failed to offer substantial evidence of causation by the January 8, 2008, deadline for the Groovers to submit evidence in opposition to the Johnston defendants’ summary-judgment motion, the Groovers were provided 10 additional days to respond to that supplemental brief, and the Groovers in fact filed a reply.

. Collectively, Dr. Johnston and Birmingham Pediatric are referred to as "the Johnston defendants.”

. The dissent cites Ex parte Borden, [Ms. 1050042, Aug. 17, 2007] — So.3d — (Ala. 2007), in support of the contention that the Groovers have presented sufficient argument regarding causation. In Ex parte Borden, the brief at issue "included 11 pages of argument regarding ineffective assistance of counsel, including some 25 citations to caselaw, along with explanations and quotations from the cited cases.” — So.3d at —.

. The Johnston defendants’ brief discusses the issue of causation at pages 41-51; that discussion includes citations to sufficient legal authority.

. According to the Johnston defendants, Dr. Adler was not qualified to testify specifically that a different outcome would have resulted if Dr. Johnston had diagnosed the B-12 deficiency earlier. The Johnston defendants point out that "Dr. Adler practices within the specialty of pediatric neurology. He is not qualified to render an opinion regarding the standard of care for a pediatrician such as Dr. Johnston, and agreed in his deposition that he was not offering any standard of care opinions regarding Dr. Johnston’s care.” The Johnston defendants' brief, p. 25. In their reply brief, the Groovers do not challenge this assertion of the Johnston defendants.

. Additionally, Dr. Adler was not specific in his testimony as to when Lennon's symptoms of B-12 deficiency had progressed to the point that they would have been recognized by an appropriate specialist. As the trial court noted: "Dr. Adler stated that though [Lennon] was not B-12 deficient during pregnancy nor during the first year of his life, that the condition developed over time and the symptoms did not show suddenly, [but] through a process of poor developmental evolution of the child.”

. As the dissent points out in its recitation of the facts, Melinda Groover on several occasions indicated to Dr. Johnston that she thought Lennon had a B-12 deficiency. 39 So.3d at 48 (Cobb, C.J., dissenting). However, there was no expert testimony indicating that, in view of that evidence, the appropriate standard of care required Dr. Johnston to diagnose Lennon’s B-12 deficiency.

. Indeed, the only other expert testimony was from Dr. Adler, a pediatric neurologist (and presumably a similarly situated “qualified specialist” like those to whom Dr. Shore referred). However, as I have noted, Dr. Adler’s opinion that earlier treatment of the B-12 deficiency would have made Lennon “better” was insufficient under McAfee.

. In view of that evidence, this Court in Parker concluded:
"While the facts do not establish that Mrs. Parker’s cancer could have been prevented altogether if Dr. Collins had rendered a prompt diagnosis based on a clearer X-ray, medical testimony suggests that Mrs. Parker's condition worsened as a direct result of a diagnosis based upon a substandard'X-ray. That evidence was sufficient to create a jury question as to proximate cause in this case; accordingly, we reverse that portion of the judgment based on the directed verdict for Dr. Collins.”
605 So.2d at 827 (emphasis added).

. Two recent decisions of this Court illustrating this principle include Mobile Infirmary Ass’n v. Tyler, 981 So.2d 1077, 1102 (Ala.2007) (finding substantial evidence of causation where expert testimony established that a nurse’s negligent failure to adequately communicate the symptoms suffered by the patient prevented the patient "from receiving *44 the medical care that probably would have prevented her death”); and Lawson v. Moore, 25 So.3d 417 (Ala.2008) (finding substantial evidence of causation where expert testimony established that the defendant doctor "acted negligently and that his alleged negligence terminated a viable intrauterine pregnancy” (emphasis added)).